DECISION AND JUDGMENT ENTRY
{¶ 1} Carlos L. Jenkins appeals the conviction and sentence entered against him by the Lawrence County Court of Common Pleas for murder with a firearm specification. Jenkins contends that the trial court erred in denying his motion for acquittal because he asserts that the record contains no evidence proving that he acted purposely. We disagree because, after viewing the evidence in a light most favorable to the prosecution, we find that a rational trier of fact could have found beyond a reasonable doubt that Jenkins acted purposely. Next, Jenkins contends that the trial court erred in excluding evidence tending to prove that another person committed the murder for which he was charged. Because we find that Jenkins failed to meet his burden of proving that the declarant was unavailable, and that he made a reasonable, good faith effort to secure the declarant's testimony, we find that the trial court did not abuse its discretion in excluding hearsay testimony of her purported declaration against interest. Next, Jenkins contends that the state committed misconduct that deprived him of his right to a fair trial. Because we find that three of the four acts Jenkins complains of did not constitute misconduct, and because Jenkins successfully negated any prejudice that may have arisen from the other act of alleged misconduct, we disagree. Finally, Jenkins contends that the trial court erred by allowing the state to offer improper rebuttal testimony. Because we find that the testimony was relevant to counter the testimony of a defense witness who alleged that the state improperly and inadequately conducted the murder investigation and Jenkins' interrogation, we disagree. Accordingly, we overrule each of Jenkins four assignments of error and affirm the trial court's judgment.
 I. {¶ 2} On September 15, 2004, the Lawrence County Grand Jury indicted Jenkins on one count of murder in violation of R.C.2903.02 with a gun specification. The indictment resulted from an incident on or about September 3, 2004, in which John R. Turvey was killed.
 {¶ 3} Turvey lived in a camper on Lane Ridge in Lawrence County, Ohio with his son. On September 3, 2004, Turvey and his son got up and drank coffee together while his son was getting ready for school. Turvey's son, who was in the tenth grade at the time of trial, testified that he got on the school bus at 7:15 a.m. From the school bus, he saw Jenkins walking along the side of the road carrying what looked like a rifle, although all of the other testimony indicated that the only gun Jenkins owned was a 12 gauge shotgun.
 {¶ 4} Turvey's friend and neighbor, John Ferrell, Sr., testified that he arrived at Turvey's home at approximately 9:00 a.m. on September 3, 2004. He noticed that the door to the camper was open, and discovered Turvey laying face down inside the camper, with blood coming from underneath the baseball cap he was wearing. Ferrell testified that Turvey kept prescription Oxycontin, other pain medication, and some marijuana in his home. He indicated that Turvey stored the drugs in a red tackle box with a padlock beside his couch.
 {¶ 5} Detective Shane Hanshaw of the Lawrence County Sheriff's Department testified that he was in charge of the murder investigation. He arrived at the scene at approximately 10:00 a.m., secured the perimeter, and waited for investigators from the Bureau of Criminal Identification ("BCI") to assist in the crime scene investigation. Det. Hanshaw testified that the investigators were unable to locate the red tacklebox in the search of Turvey's camper, although they did find a padlock on a piece of carpet just outside the front entrance to the camper.
 {¶ 6} Later that day, Det. Hanshaw spoke with Turvey's son, and learned that Jenkins had been walking along the road when Turvey's son left for school that morning. Det. Hanshaw testified that he and Det. Holland went to speak with Jenkins at his residence early the next morning. He indicated that Jenkins came out to speak with them in the sheriff's cruiser. At that time, Jenkins stated he had hunted for squirrels on the ridge that morning. Jenkins indicated that he did not know Turvey, and that he heard a shot in the area while he was hunting.
 {¶ 7} Jenkins voluntarily went to the Sheriff's Department on September 4, 2004 at approximately 8:00 p.m. to speak with Det. Hanshaw and Det. Holland. Det. Hanshaw advised Jenkins of his Miranda rights and had him sign a form acknowledging that he had been advised of his rights. Det. Hanshaw testified that he then proceeded to interview Jenkins. He began with questions that were similar to the questions he posed to Jenkins that morning, and Jenkins' answers changed. For example, Jenkins previously stated that he did not know Turvey and had never been to Turvey's residence, but later indicated that he did know Turvey and had been to his former residence.
 {¶ 8} Det. Hanshaw testified that after Det. Holland left the room, Jenkins admitted he was involved in Turvey's death. Det. Hanshaw taped a portion of Jenkins statement in which he admitted his involvement. Det. Hanshaw continued to interview Jenkins after he finished taping Jenkins' statement, and they later agreed to make a second tape to add some information. The state played the tapes for the jury at trial, and the court admitted written transcripts of the taped conversations into evidence.
 {¶ 9} The essence of Jenkins' confession during the two tape recorded statements was that he was squirrel hunting on Lane Ridge, and went to Turvey's camper to ask for permission to hunt on Turvey's property. Jenkins indicated that he left his shotgun outside, leaning against the trailer and knocked on the door. He stated that Turvey opened the door, and Jenkins walked into the camper. Turvey was sitting on the couch and Jenkins remained standing. At some point, Turvey grabbed a gun, which Jenkins thought was a rifle. Thinking that Turvey was going to try to shoot him because Turvey was "on medication," Jenkins grabbed a hold of the gun and the two men struggled over the weapon. Jenkins said that, during the struggle, he told Turvey, "man, we been friends forever man. I don't know what's wrong with you acting like this." Jenkins reported that during the struggle he was holding the gun upward in an effort to keep himself and Turvey from getting shot. The gun went off a couple of times and Turvey fell down on the floor by the couch. Jenkins thought Turvey was shot, but hoped that he had just gotten knocked down. Jenkins stated that he was scared, that he took the rifle with him, and grabbed his shotgun when he left the camper. Jenkins said he did not have the rifle with him when he got back to his car, so he thought he probably threw it down the hill outside Turvey's camper.
 {¶ 10} Det. Hanshaw testified that although the Sheriff's Department searched Turvey's property for the murder weapon, they never located the firearm. The only gun they collected from Jenkins was his 12 gauge shotgun, and it was not the murder weapon. Det. Hanshaw also indicated that there was no evidence of a fight or struggle at Turvey's camper. The testimony of Det. Hanshaw and other law enforcement personnel revealed that they did not find any of Turvey's blood or hair on the clothes Jenkins was wearing the morning of the murder. Nor did they recover any fingerprints or other physical evidence of Jenkins' presence at the scene of the crime.
 {¶ 11} After concluding the second taped interview, Det. Hanshaw arrested Jenkins for his involvement in Turvey's murder. He was placed in the Lawrence County Jail at approximately 1:10 a.m. on the morning of September 5, 2004. Christopher Jones, an inmate at the jail, informed Det. Aaron Bollinger that he had a four-hour conversation with Jenkins in the jail on the morning of September 5th, wherein Jenkins admitted shooting Turvey. Jones told Det. Bollinger, and ultimately testified that, during the conversation, Jenkins told him that he had gone to get Oxycontin at the home of a man named John, that he ended up shooting the man a few times with a .22 caliber gun, and that he left the home with a tackle box that contained Oxycontin. Det. Aaron Bollinger testified that there was no possible way Jones could have had that information unless Jenkins told him about the murder.
 {¶ 12} Jenkins denied having spoken with Jones while he was in jail. In his defense, he also offered the testimony of Donald Malone and Patrick King, two prisoners who were in the cell block when Christopher Jones claimed to have had a four-hour conversation with Jenkins. Both men testified that they did not observe any conversation between Jenkins and Jones. However, both men also testified that they were asleep during a portion of the approximately eighteen hours that both Jenkins and Jones were housed in the cellblock.
 {¶ 13} Dr. Collie Michael Trant, a forensic pathologist employed by the Franklin County Coroner's Office, testified regarding the autopsy he performed on Turvey. Dr. Trant testified that Turvey had three gunshot wounds to his head, one to his hand, one to his abdomen, and one under his left kneecap, all caused by .22 caliber bullets. He concluded that Turvey died of multiple gunshot wounds.
 {¶ 14} Jenkins presented the testimony of several alibi witnesses including his mother, his live-in girlfriend, his brother, and his niece. Jenkins also testified in his own defense. He indicated that on September 3, 2004, he awoke about 6:30 a.m., got dressed and went to his mom's for coffee. He then went hunting on Lane Ridge at about 7:30. Jenkins testified that he walked toward Turvey's camper, but stopped before he got that far. While he was walking, he claimed to have heard gunshots, but stated he thought nothing of it because it was hunting season.
 {¶ 15} Jenkins then testified that he returned to his car within approximately one-half hour, drove home, took his gun and other things in the house and watched his girlfriend's son while she worked. Jenkins took the boy to the home of his brother, Larry, where they visited with Larry, Larry's wife, and Larry's daughter, Ashley, who had returned home from school.
 {¶ 16} Larry and Ashley both testified, corroborating Jenkins' testimony that Jenkins was at their home the morning of September 3rd, and that attesting that Ashley had returned home from school. However, Steve Lambert, the principal from Ashley's school, later testified that the school's records reflect that she signed out of school on the morning of September 1st, not September 3rd as Larry, Ashley, and Jenkins testified.
 {¶ 17} Jenkins recalled speaking with Det. Hanshaw and another detective at his home and stated that he agreed to go talk with Det. Hanshaw at his office later that day. He indicated that he arrived at the Sheriff's Department at 8:00 p.m. and spoke with Det. Hanshaw and Det. Holland. He testified that he told them he was never at Turvey's home. Jenkins initially denied that Hanshaw recorded any of their conversation, but when his counsel asked him about the tape played in the courtroom, Jenkins conceded that it was his voice on the tape. On the stand, Jenkins recanted his prior taped statements. He stated that the details he gave in those statements about going to Turvey's camper, knocking on the door, and Turvey grabbing a gun never happened. He claimed that he made the taped statement because he was scared after Det. Hanshaw told him he could receive the death penalty. Jenkins denied using drugs, including Oxycontin. However, upon cross examination, he admitted to having the word "pot" tattooed on his body, although he later demonstrated to the jury that he did not, in fact, have such a tattoo.
 {¶ 18} The people who observed Jenkins on the day of Turvey's murder testified that they did not notice anything unusual about his demeanor that day. They indicated that he did not appear angry, upset, or under the influence of drugs. Jenkins character witnesses indicated that, to their knowledge, he was mentally slow and easily led, but that he was not violent and did not use drugs.
 {¶ 19} Prior to trial, the trial court granted the state's motion in limine to preclude the defense from soliciting any testimony from Jana Horner regarding any statements made to her by one Cynthia Rusk, who allegedly told Horner that she murdered Turvey. At trial and out of the presence of the jury, Jenkins counsel proffered Horner's testimony. The trial court did not permit her to testify.
 {¶ 20} On January 27, 2005, the jury found Jenkins guilty of both the murder charge and the firearm specification. Jenkins filed a motion for acquittal pursuant to Crim.R. 29(C) on January 31, 2005, alleging that the state failed to prove beyond a reasonable doubt that he acted purposely. The trial court denied Jenkins' motion and sentenced him to fifteen years to life in prison for the murder conviction and three years in prison for the firearm specification.
 {¶ 21} Jenkins timely appeals, raising the following assignments of error: I. "THE TRIAL COURT ERRED IN DENYING THE MOTION FOR ACQUITTAL FILED BY DEFENDANT IN THE ABSENCE OF EVIDENCE THAT DEFENDANT ACTED PURPOSELY." II. "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT IN EXCLUDING EVIDENCE THAT ANOTHER PERSON HAD COMMITTED THE MURDER FOR WHICH DEFENDANT IS CHARGED." III. "MISCONDUCT BY THE STATE DEPRIVED DEFENDANT OF A FAIR TRIAL." IV. THE TRIAL COURT ERRED IN ALLOWING THE STATE TO OFFER IMPROPER REBUTTAL."
 II. {¶ 22} In his first assignment of error, Jenkins contends that the trial court erred in denying his motion for acquittal. Specifically, Jenkins argues that the state failed to prove beyond a reasonable doubt that he purposely caused Turvey's death.
 {¶ 23} Our standard of review for a denial of a Crim.R. 29(C) post-verdict motion for acquittal is identical to our standard for reviewing a motion for acquittal made during trial pursuant to Crim.R. 29(A). State v. Teets, Pickaway App. No. 02CA1, 2002-Ohio-6799, at fn. 3, citing State v. Huffman (1987), 38 Ohio App.3d 84, 85. Thus, we review the trial court's denial of Jenkins' motion for acquittal for sufficiency of the evidence.State v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus.
 {¶ 24} When reviewing a case to determine whether the record contains sufficient evidence to support a criminal conviction, our function "is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. See, also, Jackson v.Virginia (1979), 443 U.S. 307, 319. This test raises a question of law and does not allow the court to weigh the evidence. Statev. Martin (1983), 20 Ohio App.3d 172, 175. Rather, this test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. Accordingly, the weight given to the evidence and the credibility of witnesses are issues for the trier of fact. State v. Thomas (1982),70 Ohio St.2d 79, 79-80; State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 25} Here, Jenkins was indicted for murder pursuant to R.C.2903.02(A), which provides, in relevant part: "No person shall purposely cause the death of another * * *." Pursuant to R.C.2901.22(A), "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
 {¶ 26} Jenkins contends that his taped confession to Det. Hanshaw does not establish that he acted purposely or with a specific intention to cause Turvey's death. Jenkins further argues that Jones' testimony merely indicates that Jenkins shot Turvey several times, but provides no indication as to whether the shooting was intentional or accidental. Finally, Jenkins argues that, while Dr. Trant testified that Turvey died of multiple gunshot wounds, he did not express an opinion on whether the wounds were intentionally inflicted. Thus, Jenkins contends that the state failed to prove that he purposely shot Turvey because no witness directly testified that he had the requisite purpose or intention to cause Turvey's death.
 {¶ 27} However, Jenkins' argument ignores the fact that a jury may infer purpose from circumstantial evidence. State v.Shue (1994), 97 Ohio App.3d 459, 466. "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof."Jenks at paragraph one of the syllabus. A jury may infer that a defendant "purposely" intended to kill from several factors, including the type of instrument used to produce death, its tendency to destroy life, and the manner of inflicting the fatal wound. State v. Stallings (2000), 89 Ohio St.3d 280, 290;State v. Robinson (1954), 161 Ohio St. 213, 118 N.E.2d 517, paragraph five of the syllabus.
 {¶ 28} Here, the record contains ample evidence to permit the jury to infer that Jenkins purposely killed Turvey. In his taped confession, Jenkins admitted to being at Turvey's residence on the morning of Turvey's death. He claimed that Turvey pulled a gun on him, they struggled over the weapon, the gun went off a couple of times, and Turvey fell down. The jury, as the trier of fact, was free to believe or disbelieve all or any part of the evidence before it, including both Jenkins' testimony and his taped confession. State v. Wagner (Feb. 29, 2000), Pickaway App. No. 99CCA23, citing Swanson v. Swanson (1976),48 Ohio App.2d 85, 97.
 {¶ 29} Despite Jenkins' claim that he and Turvey struggled over the gun, and that the shooting was essentially accidental, Det. Hanshaw testified that there was no evidence of a struggle in Turvey's camper. Nor did the investigation uncover any trace of Turvey's hair or carpet fiber on the clothes that Jenkins wore on the morning of the shooting. Nor did investigators find Turvey's blood on Jenkins clothes despite the Jenkins claims that they struggled over the weapon, and the fact that Turvey sustained multiple gunshot wounds during the alleged struggle.
 {¶ 30} Dr. Trant's testimony revealed that Turvey sustained six gunshot wounds — three to his head, one to his hand, one to his abdomen, and one under his left kneecap. Two of the shots were fired at close range, one being fired while the gun was between seven and twelve inches from Turvey's head, and the other being fired while the gun muzzle was pressed against Turvey's abdomen. Additionally, Dr. Trant testified that the gunshot to Turvey's leg was most likely fired while Turvey was seated and the shooter was standing some distance in front of him. Dr. Trant opined that two of the three shots to Turvey's head, and the shot to his abdomen would have individually been sufficient to cause Turvey's death.
 {¶ 31} The Ohio Supreme Court has repeatedly held that multiple close-range gunshots to a vital area tend to demonstrate a purpose to kill." State v. Burke, 73 Ohio St. 3d 399,1995-Ohio-290, 653 N.E.2d 242 (1995); see also State v.Lindsey, 87 Ohio St. 3d 479, 483, 2000-Ohio-465. Here, the sheer number of shots fired at vital areas of Turvey's body, including his head and abdomen, coupled with the extremely close range of two of those shots, gave the jury ample evidence to support its conclusion that Jenkins purposely caused Turvey's death. Accordingly, we overrule Jenkins' first assignment of error.
 III. {¶ 32} In his second assignment of error, Jenkins contends that the trial court erred in excluding the testimony of Jana Horner, who Jenkins asserts would testify that a woman named Cynthia Rusk actually killed Turvey. The morning of trial, the state filed a motion in limine seeking to exclude Horner's testimony, which the trial court granted. In order to preserve his objection to the trial court's ruling, Jenkins again proffered Horner's testimony at trial, and the trial court again declined to admit it.[1] Jenkins contends that the trial court erred in excluding Horner's testimony, and that the exclusion clearly prejudiced his ability to defend himself.
 {¶ 33} A trial court has broad discretion in the admission or exclusion of evidence. Urbana ex rel. Newlin v. Downing (1989),43 Ohio St.3d 109, 113. So long as a trial court exercises its discretion in accordance with the rules of procedure and evidence, a reviewing court will not reverse that judgment absent a clear showing of an abuse of discretion with attendant material prejudice to defendant. Rigby v. Lake Cty. (1991),58 Ohio St.3d 269, 271; State v. Hymore (1967), 9 Ohio St.2d 122. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. When applying the abuse of discretion standard of review, we must not substitute our judgment for that of the trial court. In re Jane Doe I (1991), 57 Ohio St.3d 135,138.
 {¶ 34} Here, Jenkins contends that the trial court should have permitted Horner to testify because her testimony involved a statement against interest, which constitutes an exception to the general rule that hearsay is not admissible. Jenkins asserts that the excluded testimony was vital to his case because, if believed, it tends to demonstrate that another person committed the crime for which Jenkins is charged. As such, Jenkins argues that it is the most material evidence that can be produced in a criminal case.
 {¶ 35} Evid.R. 804(B) provides, in relevant part: "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: * * * (3) Statement againstinterest. A statement that was at the time of its making * * * so far tended to subject the declarant to civil or criminal liability, * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."
 {¶ 36} Evid.R. 804(A) provides, in relevant part: "`Unavailability as a witness' includes any of the following situations in which the declarant: (1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; * * * (5) is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under division (B)(2), (3), or (4) of this rule, the declarant's attendance or testimony) by process or other reasonable means."
 {¶ 37} Thus, Evid.R. 804 establishes a two-part test for determining the admissibility of hearsay evidence. See, State v.Keairns (1984), 9 Ohio St.3d 228, 230. The first prong of the test requires the party seeking admission of hearsay evidence to demonstrate that that its admission is necessary because the declarant is unavailable to testify. Id. The second prong of the test requires that the out of court statement bear sufficient indicia of reliability. Id.
 {¶ 38} A declarant is not "unavailable" within the meaning of Evid.R. 804(A) unless the party seeking admission of the hearsay evidence has made "reasonable efforts in good faith to secure his presence at trial." Keairns at 230, citing Barber v. Page
(1968), 390 U.S. 719. The Ohio Supreme Court has held that in order to satisfy this burden, the proponent of the hearsay evidence must introduce evidence, "based upon the personal knowledge of witnesses rather than upon hearsay not under oath, at least when unavailability has not been clearly conceded * * *." Id. at 232, citing State v. Smith (1979),58 Ohio St.2d 344, 348, vacated and remanded (1980), 448 U.S. 902.
 {¶ 39} Here, the state did not concede that Rusk was unavailable to testify. Therefore, Jenkins had the burden of demonstrating that Rusk was unavailable to testify. Our review of the record reveals that Jenkins offered no sworn testimony that Cynthia Rusk was unavailable to testify at trial. In his brief, Jenkins cites two instances in the transcript where there were references to Rusk being held in an out of state jail. The first is a statement made by Jenkins' counsel in the context of the November 22, 2004 hearing on his motion for leave to hire an investigator. There, counsel indicated that he had learned that another person, then in custody in the Greenup County Jail, was actually involved in Turvey's murder. The second was also a statement made by Jenkins' counsel, this time at trial, when he proffered the testimony of Mr. Manering, a private investigator. There, counsel stated "Mr. Manering identified witnesses that indicated that it was Ms. Rusk who was in custody in Greenup County, Kentucky * * *." Neither of counsel's statements were made under oath, and neither statement indicates that Rusk was actually held in an out of state jail at the time of the trial.[2]
 {¶ 40} Moreover, neither counsel's unsworn statements nor the record reveal that Jenkins made any effort, let alone a reasonable, good faith effort to secure Rusk's testimony. The United States Supreme Court has observed that while various courts and commentators previously assumed the mere absence of a witness from the jurisdiction was sufficient to demonstrate unavailability, "increased cooperation between the States themselves and between the States and the Federal Government has largely deprived it of any continuing validity in the criminal law." Barber, 390 U.S. at 723.
 {¶ 41} In Barber, the court noted that the Uniform Act to Secure the Attendance of Witnesses from Without the State in Criminal Proceedings, in force in the vast majority of states, provides a mechanism to secure the appearance and testimony of witnesses located outside the state. Id. at fn. 4. See, also, R.C. 2939.26. Additionally, where a prospective witness is in federal custody, 28 U.S.C.A. 2241(c)(5) gives federal courts the power to issue writs of habeas corpus ad testificandum to secure the witness' presence. Id. at 724. The Barber court further opined that "[f]or witnesses in prison, quite probably many state courts would utilize the common-law writ of habeas corpus ad testificandum at the request of prosecutorial authorities of a sister State upon a showing that adequate safeguards to keep the prisoner in custody would be maintained." Id. at fn. 4.
 {¶ 42} R.C. 2939.26 provides a specific statutory mechanism to compel the appearance and testimony of an out of state witness in an Ohio court. While the statute does not explicitly provide for a situation when the witness is held in the other state's jail or prison, the record does not contain any sworn testimony that Rusk was, in fact, housed in another state's prison at the time of trial. Nor does the record reveal that Jenkins made any efforts to secure Rusk's testimony at trial, regardless of where she was located. If Rusk was, in fact, in jail or prison in Kentucky as Jenkins' counsel now asserts, Jenkins could have attempted to utilize the common-law writ of habeas corpus ad testificandum to procure her presence at trial. As the Barber
court noted, "`the possibility of a refusal is not the equivalent of asking and receiving a rebuff.'" Id. at 724, quoting Aldrich, J. dissenting. Furthermore, even if Jenkins could not procure Rusk's presence at trial by reasonable means, he could have attempted to procure Rusk's testimony by deposition.
 {¶ 43} In response to the state's argument that he could have utilized such procedures to procure Rusk's appearance at trial, Jenkins contends that such procedures would not have been effective in light of the "reasonable probability" that she would have claimed her Fifth Amendment privilege against self incrimination if called upon to testify. Jenkins cites State v.Alvarez (Dec. 2, 1999), Franklin App. No. 98AP-1375, for the proposition that where there is a reasonable probability that the declarant will claim the Fifth Amendment privilege against self incrimination, the requirement of unavailability is met.
 {¶ 44} However, our review of Alvarez reveals that that case involved the trial court's denial of a motion for a new trial on the ground of newly discovered evidence. The newly discovered evidence included, inter alia, an individual, by the name of Ospina, who was prepared to testify that a man named Rodriquez told him that Rodriquez actually committed the crime for which Alvarez was convicted. Id. There, the Tenth Appellate District held that the trial court's denial of the motion for new trial on the ground that the newly discovered evidence was hearsay was premature. Specifically, the Tenth District found that it was possible that Ospina's testimony could be admissible as a statement against penal interest at a new trial "if the declarants are ultimately brought before the court and decline to testify, or appellant is unable to procure the witnesses for trial." Despite Jenkins' assertions, the Alvarez
court simply did not hold that the mere possibility that a declarant might exercise his privilege against self incrimination was sufficient to support a declaration of unavailability under Evid.R. 804(A). Instead, the court merely recognized that in the event the declarant appeared and asserted his Fifth Amendment right to remain silent, or the defendant was unable to procure the presence of the declarant, then it was possible that the trial court could admit hearsay testimony as statements against penal interest.
 {¶ 45} It is impossible for this court to speculate as to what Rusk would have done if Jenkins secured her appearance at trial. While she may have exercised her privilege against self incrimination as Jenkins suggests, she could just as easily have taken the stand and denied ever having a conversation with Horner. Although we appreciate the importance of this evidence to Jenkins' case, as it could tend to prove that another person is actually responsible for killing Turvey, the fact remains that there is no evidence in the record tending to demonstrate that Jenkins and/or his counsel made any effort to procure either Rusk's appearance at trial or her deposition testimony. Therefore, Rusk was never placed in a position where she could invoke her privilege against self incrimination, and thereby form the basis for a ruling that she was unavailable to testify. Because Jenkins failed to satisfy his burden of demonstrating that he exercised reasonable efforts either to procure Rusk's attendance, or otherwise obtain Rusk's testimony, we cannot find that the trial court abused its discretion in failing to admit Horner's testimony regarding her alleged conversation with Rusk. Accordingly, we overrule Jenkins' second assignment of error.
 IV. {¶ 46} In his third assignment of error, Jenkins contends that misconduct by the state deprived him of a fair trial. Specifically, Jenkins argues that the state's questioning of various witnesses regarding tattoos, including the word "pot" and the number "666", that Jenkins allegedly had on his body, was irrelevant, improper and unfairly prejudicial to him. Additionally, Jenkins argues that the trial court permitted further misconduct by failing to require the state to produce certain allegedly discoverable materials in response to his discovery requests, including taped statements of several witnesses interviewed by the state and an inventory of items seized from the victim's home.
 {¶ 47} In order to reverse a conviction based on prosecutorial misconduct, the defendant must prove that the prosecutor's comments or conduct were improper and that they prejudicially affected the defendant's substantial rights. Statev. Smith (1984), 14 Ohio St.3d 13, 14. In applying this test, we consider the effect the misconduct had in the context of the entire trial. State v. Keenan (1993), 66 Ohio St.3d 402, 410.
 A. {¶ 48} First, Jenkins contends that the state's questioning regarding the existence of "pot" and "666" tattoos was improper and inflammatory. He cites United States v. Thomas, (C.A. 7, 2003), No. 02-1487, for the proposition that tattoo evidence which is not used for purposes of identification is often improperly offered to show propensity to commit a crime. He asserts that the only possible reason for the state's line of questioning was to prejudice the jury against him. He also notes that he had to prove the allegation to be untrue by stripping to his underwear in front of the jury to demonstrate that he did not, in fact, have such tattoos.
 {¶ 49} In contrast, the state contends that its questions regarding the existence of the tattoos were properly part of its efforts to impeach Jenkins' testimony that he did not use drugs. In arguing that its line of questioning was proper, the state places great emphasis upon the fact that it had a reasonable basis for asking the questions based upon the fact that Jenkins' criminal history, run through the National Crime Information Center (NCIC) and in the state's possession, stated that Jenkins had such tattoos. The state is correct that Evid.R. 607 requires a questioner to "have a reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact." Because the state's good faith basis for the questions was never challenged, we presume it had one. State v.Gillard (1988), 40 Ohio St.3d 226, 231, rehearing denied (1989),41 Ohio St.3d 723, certiorari denied (1989), 492 U.S. 925, overruled on other grounds in State v. McGuire (1997),80 Ohio St.3d 390, 402, 1997-Ohio-335. However, our inquiry into whether the questioning was proper does not stop there. Rather, we must determine whether the questions regarding the tattoos were otherwise relevant and admissible.
 {¶ 50} Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 402 provides that all relevant evidence is admissible, except as otherwise provided by law or rule, and that evidence that is not relevant is not admissible. Even if evidence is relevant, it is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury." Evid.R. 403(A). Moreover, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B).
 {¶ 51} As we have previously stated, a trial court has broad discretion in the admission or exclusion of evidence, and we will not reverse a trial court's judgment in that regard absent an abuse of discretion with attendant material prejudice to the defendant. See ¶ 33, supra.
 {¶ 52} Here, Jenkins contends that the trial court erred to his prejudice by allowing the state to ask various witnesses, including Jenkins, his mother, and his girlfriend's father, whether Jenkins had a tattoo of the word "pot" on his body to demonstrate his propensity to commit crime. However, our review of the record reveals that Jenkins failed to object to the state's questioning regarding the possible existence of a tattoo of the word "pot" on his body. Generally, an appellate court will not consider any assigned error which counsel could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court. State v. Gordon (1971), 28 Ohio St.2d 45 at paragraph two of the syllabus. Therefore, we find that Jenkins has waived all but plain error with regard to the questions regarding the existence of a "pot" tattoo on his body. See Crim.R. 52(B).
 {¶ 53} Here, we cannot say that the state committed misconduct by questioning witnesses regarding the existence or non-existence of a "pot" tattoo, or that the trial court abused its discretion in permitting such questioning. Evidence that Jenkins had previously used drugs or possessed a tattoo with of the word "pot" were relevant and admissible to demonstrate a possible motive for him to kill Turvey in light of the fact that the tackle box in which Turvey kept drugs, including Oxycontin and marijuana, was discovered missing from his home after his death. Thus, the questions regarding the "pot" tattoo were not admitted to show Jenkins' propensity to commit a crime, but were properly admitted in accordance with Evid.R. 404(B) to demonstrate the prosecution's theory that Jenkins' motive for killing Turvey was drugs. Even Jenkins concedes that a tattoo of the word "pot" was arguably relevant given his testimony denying drug use. Moreover, due to the questions' relevance to establish a possible motive for the killing, we cannot find that the danger of unfair prejudice substantially outweighed their probative value. Because the trial court did not abuse its discretion in allowing the state to question the witnesses regarding the existence of a "pot" tattoo, we cannot find that it committed error, let alone plain error, in permitting such questioning.
 {¶ 54} Unlike the situation regarding the "pot" tattoo, the record reflects that Jenkins did timely object to the state's only question regarding the possible existence of a "666" tattoo. Although Jenkins does not state in his brief his reasons for believing the reference to "666" to be prejudicial to him, we note that the number is commonly known as "the devil's number," or "the mark of the beast." We fail to see how the existence or non-existence of such a tattoo is even remotely relevant to the state's case, given that the record contains no allegations that Turvey's killing was linked to satanism or devil worship. Therefore, it had no bearing upon any motive advanced by the state, and the only purpose we can find for mentioning such a tattoo would be to inflame the jury and improperly imply that Jenkins had a propensity to kill based upon his affinity for this number commonly associated with evil. Therefore, the trial court should have sustained Jenkins' objection to the single question regarding the existence of a "666" tattoo.
 {¶ 55} Although the state's single question regarding the existence of a "666" tattoo may have been improper, we are not persuaded that the question, posed to the father of Jenkins' girlfriend, materially prejudiced Jenkins. We agree that any testimony regarding a "666" tattoo would be quite inflammatory and damaging if Jenkins indeed possessed such a tattoo. But here, the witness denied having any knowledge of Jenkins having such a tattoo, and Jenkins affirmatively disproved the state's allegations by disrobing and demonstrating to the jury that he did not have such a tattoo.[3] Therefore, we conclude that Jenkins effectively negated any prejudical effect that the question may have had. Thus, we conclude that the trial court's failure to sustain Jenkins' objection did not rise to the level of reversible error.
 B. {¶ 56} Next, Jenkins contends that the state committed misconduct and deprived him of a fair trial by failing to provide taped statements of several witnesses and an inventory of items removed from the victim's home in response to Jenkins' discovery requests. The state argues that, pursuant to Crim.R. 16, the items Jenkins sought to obtain were not discoverable.
 {¶ 57} The grant or denial of discovery motions in a criminal case rests within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent an abuse of that discretion. State v. Laskey (1970),21 Ohio St.2d 187, 192.
 {¶ 58} Crim.R. 16(B)(2) provides that, "this rule does not authorize the discovery or inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses to state agents." This rule clearly provides that defendants are not entitled to receive pretrial discovery of witnesses' statements. See, State v. Landrum (1990), 53 Ohio St.3d 107,119. The rule only requires the state to give an accused a copy of a witness statement only if the trial judge determines there are inconsistencies between the witness' testimony at trial and the prior statement. Crim.R. 16(B)(1)(g). Because the taped statements Jenkins sought to obtain were from witnesses who did not testify at trial, let alone testify inconsistent with their prior statements, under these rules, the trial court did not err in denying Jenkins request.
 {¶ 59} Despite the provisions of Crim.R. 16(B)(1)(g) and 16(B)(2), Jenkins contends he was entitled to receive the taped witness statements because "they might contain exculpatory evidence," and because he previously filed a demand for discovery, asking the state to disclose all evidence favorable to him and material either to guilt or punishment in accordance with Crim.R. 16(B)(1)(f). In Brady v. Maryland (1963), 373 U.S. 83,87, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. Therefore, we must consider whether the taped witness statements were material either to Jenkins' guilt or punishment. In this context, materiality is a question which we review de novo. State v. Hesson (1996), 110 Ohio App.3d 845,851.
 {¶ 60} "In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome. (United States v. Bagley [1985], 473 U.S. 667,105 S.Ct. 3375, 87 L.Ed.2d 481, followed.)" Id. at 852, quotingState v. Johnston (1988), 39 Ohio St.3d 48 at paragraphs four and five of the syllabus. See, also, State v. Jackson (1991),57 Ohio St.3d 29, 33. The defense bears the burden of proving that the state suppressed material exculpatory evidence. Statev. Jackson (1991), 57 Ohio St.3d 29, 33, citing Talamante v.Romero (C.A.10, 1980), 620 F.2d 784; Monroe v. Blackburn
(C.A.5, 1979), 607 F.2d 148. See, also, State v. Wickline
(1990), 50 Ohio St.3d 114, 117.
 {¶ 61} Here, the trial transcript reveals that the only argument Jenkins made regarding the materiality of any of the taped witness statements was that "at least one witness had heard one (1) shot the morning of the killing, which would indicate that Mr. Jenkins' statement was not misleading or erroneous." However, as the state noted, a witness' statement verifying that she heard one shot, even if it did corroborate Jenkins' statement that he heard one shot is of little, if any, exculpatory value given that the physical evidence clearly indicates that Turvey was shot multiple times. In light of the undisputed fact that Turvey was shot multiple times on the morning of September 3, 2004, we cannot find a reasonable probability that if the statement of one witness, to the effect that she heard one shot the morning of Turvey's death, had been disclosed to Jenkins, the result of the proceeding would have been different. Nor can we determine the materiality of any other taped witness statements in the state's possession. Accordingly, we cannot find that the state committed misconduct in refusing to produce the taped witness statements, or that the trial court abused its discretion in failing to order the state to do so.
 {¶ 62} Next, we address Jenkins' argument that the trial court abused its discretion in failing to require the state to produce the inventory of evidence removed from Turvey's home. Generally, Crim.R. 16(B)(2) exempts police reports from discovery. See, State v. Moore (1991), 74 Ohio App.3d 334, 340, citing State v. Workman (1984), 14 Ohio App.3d 385; State v.Cummings (1985), 23 Ohio App.3d 40; Beachwood v. Cohen (1986),29 Ohio App.3d 226. However, in his reply brief, Jenkins asserts that the rule does not bar his request that the state produce the inventory of the evidence taken from the murder scene because he claims it contains exculpatory evidence that should have been produced pursuant to Crim.R. 16(B)(1)(f).
 {¶ 63} Our review of the record reveals that Jenkins became aware of the existence of a written inventory of items removed from Turvey's home during his counsel's cross-examination of Det. Bollinger, at which time, the following exchange took place:
"Q. Where is that list now?
A. It should be with the report.
Q. Where is the report?
A. We would have a copy at the office or Detective Hanshaw would have it.
Q. We want to request that now.
[PROSECUTOR:] What are you requesting?
COURT: Subpoena what you want to subpoena.
[PROSECUTOR:] We've made this all available to you."
 {¶ 64} Although Jenkins orally requested the production of the inventory at trial, he failed to challenge the state's assertion that it had previously made the inventory available to him. He also failed to make any argument at trial that the requested inventory was material to his guilt or punishment such that the state would be required to produce it, and, consequently, the trial court did not rule upon that issue. "It is a general rule that an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." State v. Glaros (1960),170 Ohio St. 471, paragraph one of the syllabus. Because Jenkins failed to bring this issue to the trial court's attention so that it could pass upon the issue, and because it involves matters outside the record, we decline to address it here.
 C. {¶ 65} In conclusion, we have found that: (1) The state did not commit misconduct by inquiring about whether Jenkins had a "pot" tattoo because if he did, it would have been relevant and admissible to demonstrate a possible motive for Jenkins to kill Turvey; (2) Although the state may have improperly inquired about the existence of a "666", Jenkins effectively negated any prejudicial effect by demonstrating that he did not, in fact, have such a tattoo; (3) The trial court did not err in refusing to order the state to produce taped witness statements or an inventory of the items it removed from the victim's house, where the items are not generally discoverable under Crim.R. 16, and Jenkins failed to demonstrate that the items contained exculpatory evidence that would require the state to provide them pursuant to Crim.R. 16(B)(1)(f). Therefore, we disagree with Jenkins' assertions that misconduct by the state deprived him of a fair trial. Accordingly, we overrule Jenkins' third assignment of error.
 V. {¶ 66} In his fourth assignment of error, Jenkins contends that the trial court erred in permitting the state to offer improper rebuttal evidence. Jenkins contends that the trial court erred by permitting the state to question Det. Hanshaw about his qualifications as an interrogator to rebut the testimony of Wayne Sweeney. In his testimony, Sweeney indicated that Det. Hanshaw improperly and inadequately conducted both the investigation of Turvey's murder, and Jenkins' interrogation. Jenkins asserts that the introduction of Det. Hanshaw's qualifications as an investigator and interrogator prejudiced him because it suggested to the jury that it should disregard Sweeney's criticisms based upon Det. Hanshaw's exceptional qualifications.
 {¶ 67} Rebuttal evidence is "evidence that answers, does away with, or disputes the evidence given by the opposite party."Toledo and Ohio Central Railway Co. v. Wales (1896), 11 Ohio C.C. 371, 5 Ohio C.D. 168. As we previously stated, a trial court has broad discretion in the admission or exclusion of evidence, and we will not reverse a trial court's judgment in that regard absent an abuse of discretion with attendant material prejudice to the defendant. See ¶ 33 supra. Consequently, trial courts have wide latitude in admitting rebuttal testimony, absent an abuse of discretion. See Phung v. Waste Management, Inc. (1994),71 Ohio St.3d 408, 411; State v. Barker (1978), 53 Ohio St.2d 135, 145;State v. Vails (1970), 22 Ohio St.2d 103, 106.
 {¶ 68} Here, Sweeney testified that he observed a number of items at the scene of the crime that he believed were significant to the investigation, but that he believed law enforcement personnel overlooked. Sweeney did concede that, to his knowledge, the defense did not ask the state to collect and analyze any of the items he alleged that the state overlooked.
 {¶ 69} With regard to the state's interrogation of Jenkins, Sweeney testified that if he obtained a confession, he would elicit details from the suspect about how he committed the crime, to assist him in verifying the truth of the confession. For example, Sweeney indicated that he would want the suspect to give him details about what the direction that the shots were fired, or things that the suspect did at the scene so that he could compare those details with evidence obtained at the crime scene to confirm the accuracy of the confession.
 {¶ 70} Sweeney also testified that, in his opinion and based upon his experience, the proper way to conduct an interrogation was to record the entire interrogation. When asked upon cross examination whether there were legitimate reasons not to use a recording when interviewing a suspect, Sweeney replied, "To, the only thing I would say was if you were trying to get some information maybe not of a good way, maybe a coerced way, you know." Upon further questioning regarding legitimate reasons for not recording an entire interrogation, Sweeney indicated that he did not know of any. But he agreed that in some circumstances, taping the entire interrogation might put the suspect on the defensive, making them less likely to open up to the interrogator. When asked if he would recognize that reason for not taping an entire interrogation as a "legitimate means of interview," Sweeney did not agree or disagree, but replied, "That would be his technique."
 {¶ 71} On rebuttal, the state elicited testimony from Det. Hanshaw regarding his qualifications in crime scene investigation and interrogation. Jenkins now contends that this testimony did not properly rebut Sweeney's testimony that, because Det. Hanshaw failed to elicit details that would have enabled him to verify statements Jenkins made during the interrogation, Det. Hanshaw's interrogation was incomplete.
 {¶ 72} We note that the overall tenor of Sweeney's testimony was to allege that Det. Hanshaw improperly and inadequately conducted the investigation of Turvey's murder, and Jenkins' interrogation. Thus, Sweeney's testimony placed Det. Hanshaw's procedures, methodology, and skill as an interrogator squarely at issue. Hence, Det. Hanshaw's extensive training and his certification as an instructor for the Ohio Peace Officers Basic Police Training Academy is relevant to refute Sweeney's attack on the legitimacy of Det. Hanshaw skill and interrogation practices.
 {¶ 73} Moreover, even if Det. Hanshaw's testimony would have been more properly introduced during the state's case-in-chief, the order in which evidence shall be produced lies within the sound discretion of the trial court. Cities Service Oil Co. v.Burkett (1964), 176 Ohio St. 449, 452; R.C. 2945.10. Unless the court patently abuses that discretion, there is no prejudicial error. Id. Although Jenkins claims that Det. Hanshaw's testimony was merely a "reprise" of his credentials, our review of the record reveals that Det. Hanshaw did not testify regarding his training as an investigator or interrogator upon direct examination. He merely stated that he had been in law enforcement for approximately thirteen years and had been a detective for almost four years. Thus, by permitting the testimony, the trial court did not allow the state to merely repeat information already provided to the jury. Instead, it ensured that the jury had relevant information regarding the qualifications of both Sweeney and Det. Hanshaw to aid it in determining the credibility of each witness and the respective weight it should give to their testimony.
 {¶ 74} Based upon the foregoing, we cannot find that the trial court abused its discretion in permitting Det. Hanshaw to testify regarding his qualifications as an investigator and interrogator during rebuttal. Accordingly, we overrule Jenkins' fourth assignment of error.
 VI. {¶ 75} In conclusion, we overrule each of Jenkins' four assignments of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Lawrence County Court of Common Pleas to carry this judgment into execution.
If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is continued for a period of sixty days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. The stay as herein continued will terminate in any event at the expiration of the sixty day period.
The stay shall terminate earlier if the appellant fails to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec.2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of said sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Harsha, P.J. and McFarland, J.: Concur in Judgment and Opinion.
[1] In his proffer, Jenkins' counsel stated: "I just want to proffer her to the Court. We have her available to testify. She would testify that Cindy Rusk told her that she, in fact, shot John Turvey, and we believe that there is (sic) circumstantial guarantees of trustworthiness. This was stated in the basis of a close relationship between the parties, and a spontaneous comment. We believe that there are, in addition to that, surrounding circumstances. The fact that she was present at Mr. Turvey's house all the time, that would lend credence to the confession."
[2] The Tenth District Court of Appeals has held that a trial court did not abuse its discretion in determining a witness was unavailable, as contemplated by the rules of evidence, where the hearsay proponent's counsel was sworn and testified that he had contacted the police department in Greenville, Tennessee and learned that the declarant was incarcerated in that city's jail. See, State Auto. Mut. Ins. Co. v. Lytle (Mar. 5, 1985), Franklin App. No. 84AP-424.
[3] Jenkins contends that he could only negate the state's improper question by resorting to the "humiliating expedient" of stripping to his underwear before the jury. However, we fail to see why Jenkins did not pursue the less embarrassing route of disrobing for counsel and the state outside the presence of the jury and then entering a stipulation that he did not have the alleged tattoos.