The STATE of Ohio, Appellee,

v.

TERRY, Appellant.

[Cite as *State v. Terry*, 186 Ohio App.3d 670, 2010-Ohio-1604.]

Court of Appeals of Ohio,
Fourth District, Athens County.

No. 09CA23.

Decided March 31, 2010.

C. David Warren, Athens County Prosecuting Attorney, and George J. Reitmeier, Assistant Prosecuting Attorney, for appellee.

Mickey Prisley, for appellant.

---

HARSHA, Judge.

{¶ 1} An Athens County jury convicted Thoma E.S. Terry of one count of grand theft, one count of forgery, one count of receiving stolen property, and one count of passing bad checks. The charges stemmed from Terry's deposit of a check for $38,921.24 into the bank account of a friend. After that check cleared the bank, the friend obtained a cashier's check in Terry's name for a sum slightly less than the deposit. Terry negotiated the cashier's check for cash and another cashier's check. Later, when he attempted to wire a large sum to a bank in Japan, the bank president became suspicious. Terry claimed that the $38,921.24 check was his paycheck and produced documents to demonstrate that he was employed as a receiving officer for a Chinese plastics company. The bank president, who knew Terry from high school, remained skeptical and called the police. An investigation revealed that the $38,921.24 check was real, but it had been stolen and altered so that it would be payable to Terry.

{¶ 2} On appeal, Terry initially argues that the state produced insufficient evidence to prove the "knowingly" element of any of his convictions. Although the jury had to rely on circumstantial evidence in determining his mental state, the totality of the circumstances allowed reasonable jurors to conclude that Terry (1) possessed the check, (2) knew it was stolen, and (3) knew it was altered. Therefore, sufficient evidence supports his convictions for theft, forgery, and receiving stolen property.

{¶ 3} However, the evidence was legally insufficient to convict Terry of the crime of passing bad checks. That crime is designed to punish the circulation of worthless or bogus checks, i.e., checks negotiated or transferred by one who knows they will reach the drawee bank and be dishonored for insufficient funds, or a closed account, for example. The crime was not intended to punish one who negotiates altered or forged checks with the belief that the check will be honored. Terry's scheme depended on the drawee bank accepting the forged check and honoring it, which it did. Therefore, the state failed to put forth sufficient

evidence indicating that Terry knew the check would be dishonored, and we reverse his conviction for passing bad checks.

{¶ 4} Terry also contends that the state produced insufficient evidence of the specification in his forgery indictment that would allow the state to seize the money he had when he was arrested. However, this argument is premised on a factual inaccuracy. Although the grand jury initially indicted Terry for forgery with this specification, the jury did not ultimately convict him of it. In fact, before closing arguments, Terry stipulated that the money could be forfeited to the state.

{¶ 5} Next, Terry argues that his convictions were against the manifest weight of the evidence. He contends that the jury lost its way in concluding that he acted knowingly in any of the charged offenses. We again conclude that the circumstantial evidence warranted a guilty finding. Thus, we hold that Terry's convictions for grand theft, forgery, and receiving stolen property were not against the manifest weight of the evidence. And because no one has raised the issue of merger on the theft and receiving-stolen-property convictions, we do not address it either.

## I. Summary of the Case

{¶ 6} On October 23, 2008, Venice Regional Medical Center of Venice, Florida issued check number 0050852 in the amount of $38,921.24 made payable to Mondial Assistance, an insurance company. Venice mailed the check to Mondial's office in Ontario, Canada. The details concerning what happened to the check after it was mailed are unclear. But, as illustrated by the following circumstances brought out at trial, the state sought to establish that Terry was involved in a money-laundering scheme involving the check.

{¶ 7} On November 6, 2008, someone sent a DHL shipment from Brampton, Ontario to Terry's home address. DHL attempted to deliver the shipment on November 7, 2008, but apparently Terry was not home to receive the package. Later that day, Terry received an e-mail from "Ye Junpei" of "Feilong Plastic Co" stating that Terry had missed a DHL shipment containing a payment sent to him from a Feilong customer named Robert Dean. The e-mail instructed Terry to receive the shipment on the next delivery attempt and then to contact Junpei after he deposited the check. When DHL made delivery on November 10, 2008, "T.Terry" signed for the package.

{¶ 8} The next day, Terry and his friend, Lori Wolfe, drove to the banking window at the Hocking Valley Bank in Albany, Ohio. Wolfe gave the teller a check for $38,921.24 to be deposited into her account. The state contends that this was the same check Venice had previously issued to Mondial. But now the check was payable to "Thomas E.S. Terry" and both Terry and Wolfe endorsed

the back of it. The teller informed Terry and Wolfe that the funds from the check would not be available for 11 business days.

{¶ 9} Eleven business days later, on November 28, Wolfe came back to the Albany branch and attempted to withdraw the amount of the check, $38,921.24. However, Wolfe had drawn some checks on the account in the meantime and the teller informed her that the available balance was around $38,800. The teller additionally informed Wolfe that the bank could not give her that much cash but could issue her a cashier's check. Wolfe told the teller that she would confer with her friend who was waiting outside because it was his money. Wolfe returned after a few minutes and had the teller draw up a cashier's check in the amount of $38,700 payable to Thoma Terry.

{¶ 10} Later that day, Terry entered the main branch of Hocking Valley Bank in Athens, Ohio. He presented the teller with the $38,700 cashier's check and asked for cash. A bank supervisor told Terry that the bank did not have that much cash on hand. The supervisor offered to provide him with $20,000 in cash and the balance in the form of another cashier's check, for $18,700. Terry agreed. Terry off-handedly explained to the bank supervisor that he was starting a recording studio and needed the cash to pay lawyers.

{¶ 11} A week later, Terry returned to the Athens bank location and again met with the supervisor, stating that he wished to wire $23,000 to a bank in Tokyo, Japan. While Terry filled out the necessary paperwork, the bank supervisor spoke with the bank president, Scott Nisley, who informed the supervisor that the bank did not have the ability to wire funds on Saturday. Terry was told that he would have to return on Monday to complete the transaction.

{¶ 12} When Terry entered the bank early Monday morning, Nisley questioned him about a separate check that Terry had deposited for $4,588.93 from Geico Insurance Company.[1] After Nisley expressed his concern that the Geico check was not valid, Terry showed Nisley a letter that purported to be from Geico. It stated that Terry had won $100,000 and the check was intended to cover the estimated 3.8 percent taxes on the winnings. Nisley explained that this letter made him even more suspicious because $4,588.93 is not 3.8 percent of $100,000. Furthermore, Nisley believed that the actual taxes would have been closer to 20 percent.

---

1. The record is unclear, but it appears that Terry may have deposited this separate check into Wolfe's account as well (Nisley testified that he thought it was deposited into the account of an Albany bank customer). Nisley explained that he contacted Geico before meeting with Terry and determined that the check was not real. The jury was instructed that they could consider the Geico check and Nisley's testimony concerning it only for the purposes of evaluating Nisley's state of mind when he met with Terry.

{¶ 13} At some point, the discussion shifted to the $38,921.24 check. Nisley expressed his doubt to Terry that this check was legitimate. Terry told Nisley that it was his paycheck. Terry went out to his car and returned with several documents to prove his employment. He showed Nisley an e-mail from Ye Junpei, a representative of Feilong Plastic Company. The document indicates the company is seeking persons to act as receiving officers and states that any person approved to be Feilong's representative will be entitled to 8 percent of "whatever amount you receive from customers who are making payments on outstanding invoices on behalf of our company." The document also states that an approved representative would be entitled to an additional monthly salary of $1,500. It concludes by asking interested individuals to reply with their name and contact information and that full details of the job would follow. The handwritten words "Start Today 10–30–08" appear at the top of the letter. Terry apparently told Nisley that this indicated his start date with Feilong.

{¶ 14} Terry also produced a document purporting to be a sales invoice from Feilong Plastic to "Robert Dean, Newline Finance Co." No address appears for Newline Finance Company. The invoice lists a number of seemingly random and ambiguous goods including standing zipper bags, tearable membrane covers, and one-way coffee bags. The individual unit prices of these items appear highly inflated. For instance, a quantity of 60 of something called "liquid packaging" was listed as sold for $1,303.40 per unit for a total invoice amount of $78,204. Eighty vacuum-save storage bags, listed at a unit price of $1,197, were allegedly sold for a total of $95,800. One-way coffee bags are $575.42 each. The total invoice charge is $350,309.40.

{¶ 15} Not being convinced by these documents, Nisley called the police. After being arrested by the Athens Police Department, Terry was indicted on one count of theft, two counts of forgery, one count of receiving stolen property, and one count of passing bad checks.

{¶ 16} At trial, the state presented testimony from the director of finance at Venice Regional Medical, several Hocking Valley bank employees, an Athens police detective, and Lori Wolfe. Terry did not testify on his own behalf and rested his case at the conclusion of the state's evidence. The jury found him guilty of all counts except the second count of forgery. This appeal followed.

## II. Assignments of Error

{¶ 17} Terry assigns the following errors:

Assignment of Error No. 1: The trial court erred and thereby deprived Appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution by overruling Appellant's Crim.R. 29 motion for judgment of

acquittal, as the prosecution failed to offer sufficient evidence to prove beyond a reasonable doubt each and every element of the offenses of theft, forgery, receiving stolen property, and passing bad checks.

Assignment of Error No. 2: The trial court erred and thereby deprived Appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution by finding Appellant guilty, as the verdicts for theft, forgery, receiving stolen property, and passing bad checks were against the manifest weight of the evidence.

## III. Sufficiency of the Evidence

{¶ 18} Terry contends that the trial court erred in denying his Crim.R. 29(A) motion for judgment of acquittal on the counts of theft, forgery, receiving stolen property, and passing bad checks. That motion tests whether the state has presented sufficient evidence to allow the charge to be decided by the jury. *State v. Umphries,* Ross App. No. 02CA2662, 2003-Ohio-599, 2003 WL 257410, at ¶ 6, citing *State v. Williams* (1996), 74 Ohio St.3d 569, 576, 660 N.E.2d 724; and *State v. Miley* (1996), 114 Ohio App.3d 738, 742, 684 N.E.2d 102. Under Crim.R. 29, the trial court must enter a judgment of acquittal when the state's evidence is insufficient as a matter of law to sustain a conviction.

{¶ 19} When reviewing the sufficiency of the evidence to support a criminal conviction, an appellate court's function "is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. Our evaluation of the sufficiency of the evidence raises a question of law and does not permit us to weigh the evidence. *State v. Simms,* 165 Ohio App.3d 83, 2005-Ohio-5681, 844 N.E.2d 1212, at ¶ 9, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

### A. Evidence of Terry's knowledge.

{¶ 20} Terry claims that the state offered insufficient evidence to prove that he acted knowingly in conjunction with his convictions for theft, forgery, receiving stolen property, and passing bad checks. He argues that there was no evidence, direct or circumstantial, indicating that he knew the check was not his own, was forged, had been obtained through a theft offense, or would be dishonored. He

points out that the evidence demonstrated that no one, including the bank teller, could tell that the check had been altered from its original form. Indeed, the bank teller testified at trial that the check did not appear altered. The check is part of our record and appears to the untrained eye to be legitimate. Terry's name and address are listed in printed text on the payee section of the check. However, an Athens police officer testified that it was his belief that the payee section of the check was "washed" with certain chemicals and Terry's information was substituted.

{¶ 21} The crimes of theft, forgery, receiving stolen property, and passing bad checks require the state to prove that Terry acted with knowledge. Theft, codified at R.C. 2913.02(A)(1), states that "[n]o person, with purpose to deprive the owner of property or services, shall *knowingly* obtain or exert control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent." (Emphasis added.) Forgery requires the state to show that the defendant, "with purpose to defraud, or *knowing* that the person is facilitating a fraud * * * utter[ed], or posses[ed] with purpose to utter, any writing that the person *knows* to have been forged." (Emphasis added.) R.C. 2913.31(A)(3). Receiving stolen property, codified at R.C. 2913.51(A), states that "[n]o person shall receive, retain, or dispose of property of another *knowing* or having reasonable cause to believe that the property has been obtained through commission of a theft offense. (Emphasis added.) And passing bad checks, codified at R.C. 2913.11(B), states that [n]o person, with purpose to defraud, shall issue or transfer or cause to be issued or transferred a check or other negotiable instrument, *knowing* that it will be dishonored or knowing that a person has ordered or will order stop payment on the check or other negotiable instrument." (Emphasis added.)

{¶ 22} R.C. 2901.22(B), defining the culpable mental state of knowledge, explains that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." Knowledge, like all kinds of intent, can be inferred from circumstantial evidence. See *State v. Seiber* (1990), 56 Ohio St.3d 4, 13–14, 564 N.E.2d 408. And often knowledge can be established only by circumstantial evidence. This is because the fact-finder is incapable of peering into the mind of the criminal defendant. *State v. Adams* (June 8, 1995), Ross App. No. 94CA2041, 1995 WL 360247, at *4, citing *State v. Flowers* (1984), 16 Ohio App.3d 313, 16 OBR 344, 475 N.E.2d 790, citing *State v. Huffman* (1936), 131 Ohio St. 27, 5 O.O. 325, 1 N.E.2d 313. If the defendant does not testify as to his state of mind, the fact-finder must decide what his intent is by looking at the

surrounding facts and circumstances. See *State v. Lott* (1990), 51 Ohio St.3d 160, 168, 555 N.E.2d 293.

{¶ 23} "Circumstantial evidence and direct evidence inherently possess the same probative value * * *." *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus. Whether the evidence is direct in nature, or circumstantial, the jury is being asked to do the same thing: "weigh the chances that the evidence correctly points to guilt" and "use its experience with people and events in weighing the probabilities." *Holland v. United States* (1954), 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150.

{¶ 24} Viewing the circumstantial evidence in a light most favorable to the prosecution, we conclude that it was sufficient to convince a reasonable juror that Terry had the requisite knowledge for his convictions for theft, forgery, and receiving stolen property. Even though the forged check passed undetected through the bank, the following evidence supports a conclusion that Terry was aware that the check was not his own to deposit: it was forged and it was obtained through the commission of a theft offense. We separately address the sufficiency of the state's evidence concerning passing bad checks in the next section of this opinion.

{¶ 25} Terry was in communication with a person named "Ye Junpei" concerning a DHL package sent from Ontario, Canada. The day after receiving the package, Terry endorsed and deposited a check issued by Venice Regional Medical for a large amount of money. The financial director of Venice testified that the company had no association with Terry. The check itself was made out to "Thomas E.S. Terry," a slight misspelling of Terry's real name "Thoma E.S. Terry." Terry did not deposit the check into his own bank account but used the bank account of his friend Lori Wolfe to negotiate it. Wolfe is cognitively disabled and testified that she thought Terry was a computer consultant and that the money was from consulting.

{¶ 26} On the first date of availability, Terry went back to the bank with Wolfe to obtain the funds from the check. He immediately took a cashier's check for $38,700 to a separate bank location and tried to cash it. While making this transaction, he told the bank supervisor that he needed the cash to pay lawyers for a recording studio he was building. Terry listed his occupation as "studio recording engineer" on a currency-transaction form.

{¶ 27} A week later, Terry attempted to wire $23,000 to a bank in Tokyo, Japan. Later, Terry told a bank president that the check for $38,921.24 was a paycheck. He showed Nisley an e-mail from Ye Junpei purporting to establish his employment with the Feilong Plastics Company. The terms of the employment listed in the letter appear suspicious. A Feilong receiving officer would be entitled to an apparently limitless take of 8 percent of any amount of money

received on behalf of Feilong, plus an additional monthly salary of $1,500. Ostensibly, all one had to do was accept, deposit, and wire money. Nisley noticed that the alleged start date written on the letter, October 30, was after the date of the alleged paycheck, October 23.

{¶ 28} Terry also produced to Nisley a purported invoice for $350,309.40 from Feilong to Robert Dean of the Newline Finance Company. This document shows a list of ambiguous items and quantities. The prices of the items appear highly inflated. Even if this suspect invoice was legitimate, it in no way explains why Terry received a check for $38,921.24 from Venice Regional. Nor does 8 percent of the invoice amount, $28,024, correspond with the amount of the Venice check.

{¶ 29} Reasonable jurors could interpret the evidence as circumstantial proof of Terry's knowing complicity in a money-laundering scheme. A reasonable juror could conclude that Terry's job—one requiring little more than depositing a check and wiring a percentage of funds outside of the country—was not legitimate. The documents purporting to establish his employment arrangement were so suspect that a reasonable juror could conclude that not even Terry believed in their authenticity. He first told a bank supervisor that he needed the funds to pay lawyers for a recording studio. Terry later tried to convince Nisley that he was employed by Feilong. And the check itself, which was made out to a misspelling of Terry's full name, and purportedly was a payment for products invoiced to Newline Finance Company, came from an entirely separate entity, Venice.

{¶ 30} We acknowledge that the evidence might indicate that Terry did not know that the check was stolen. The check was such a good forgery that it passed undetected through the banking system. Perhaps Terry was naïve enough not to question the legitimacy of his employment with Feilong. He certainly never attempted to hide his involvement. He deposited and endorsed the check, had a cashier's check made out in his name, and filled out a currency-transaction report with the bank fully identifying himself. Also, his willingness to share suspect documents with Nisley to prove his employment could indicate that he believed they were authentic. But this is merely a separate interpretation of the circumstantial evidence. And it is the jurors' duty to choose among competing reasonable interpretations of the circumstantial evidence, not ours.

{¶ 31} When viewed in their totality, the circumstances here were legally sufficient to show that Terry acted with knowledge for purposes of his conviction for grand theft. The financial director of Venice testified that the company had no affiliation with Terry and that it did not give him permission to negotiate the check. The jury could infer from this testimony and other circumstances that Terry knowingly obtained Venice's property without their consent.

{¶ 32} The circumstances also could reasonably indicate to the jury Terry's awareness that the check was not legitimate and was in fact forged. Although

the check itself was a very good forgery, Terry had no reason to receive a check from Venice. Thus, jurors could reasonably conclude that Terry was aware that the check was illegitimate and a forgery. By depositing the check, he knowingly committed the crime of uttering a forged document.

{¶ 33} These circumstances are also sufficient to prove that Terry knew or had reasonable cause to believe that the check was obtained through commission of a theft offense. "Absent an admission by a defendant, the question of whether there was reasonable cause for a defendant to know if an item was stolen can only be shown by circumstantial evidence." *State v. LaFerrara*, Franklin App. No. 03AP–747, 2004-Ohio-1978, 2004 WL 835863, at ¶ 11, citing *State v. Hankerson* (1982), 70 Ohio St.2d 87, 92, 24 O.O.3d 155, 434 N.E.2d 1362. A jury may arrive at a finding of guilt by inference in a prosecution for receiving stolen property when the accused's possession of recently stolen property is not satisfactorily explained in light of surrounding circumstances developed from the evidence. See *State v. Arthur* (1975), 42 Ohio St.2d 67, 71 O.O.2d 42, 325 N.E.2d 888. Terry did not testify and thus explain why he thought the check was legitimate. All other circumstances could reasonably indicate to jurors that Terry knew the check was stolen. Accordingly, we overrule Terry's first assignment of error, which challenged the sufficiency of the evidence for his convictions of theft, forgery, and receiving stolen property.

### B. Sufficiency of the evidence for passing bad checks

{¶ 34} The crime of passing bad checks is codified at R.C. 2913.11(B) and states that "[n]o person, with purpose to defraud, shall issue or transfer or cause to be issued or transferred a check or other negotiable instrument, knowing that it will be dishonored or knowing that a person has ordered or will order stop payment on the check or other negotiable instrument."

{¶ 35} The Revised Code explains that a presumption of knowledge of dishonor exists when "(1) [t]he drawer had no account with the drawee at the time of issue or the stated date, whichever is later; (2) [t]he check or other negotiable instrument was properly refused payment for insufficient funds upon presentment within thirty days after issue or the stated date, whichever is later, and the liability of the drawer, [e]ndorser, or any party who may be liable thereon is not discharged by payment or satisfaction within ten days after receiving notice of dishonor." R.C. 2913.11(C).

{¶ 36} As Terry argues, the evidence at trial indicates that the check, despite being a forgery, was successfully negotiated and honored. The crime of passing a bad check requires proof that the defendant possessed knowledge that the check would be dishonored. Thus, Terry argues that the state could prove no such knowledge on his part when in fact the check was later honored after an 11–day holding period. In essence, Terry argues that the state charged him with a

statute that does not prohibit the conduct he committed, i.e., the wrong crime. We agree because the offense for which he was indicted applies to worthless checks, not forged ones.

{¶ 37} R.C. 2913.11(B) is designed to protect the negotiability of commercial paper by punishing those who issue or utter a bogus or worthless check. See Comments, Legislative Service Commission (1973). The statute is broadly drawn to prohibit one from placing in circulation any negotiable instrument that the offender knows will be dishonored. Id. However, the term "dishonor" has a very limited and specific meaning within this context. Many of the terms used here are defined in R.C. Title 13, and the comments to R.C. 2913.11(B) refer us specifically to R.C. Chapter 1303. Id. Thus, we must look to both R.C. 2913.11 and 1303.62 et seq. to discern what conduct R.C. 2913.11(B) prohibits.

{¶ 38} R.C. 1303.62 addresses "dishonor." In the case of bank collections, dishonor occurs when the check is seasonably returned by the midnight deadline as provided by Article 4 of the Uniform Commercial Code ("UCC"). See R.C. 1303.62(B)(1); UCC 3–502(b)(1); R.C. 1304.27. "Dishonor" is a term of art that does not simply mean that the drawee bank ultimately refuses to pay the check. Rather, when read together, R.C. 1303.62 through 1303.65 and UCC 3–502 through 3–505 explain that dishonor occurs when the drawee bank refuses to pay the check upon presentment for reasons other than forgery or alteration.

{¶ 39} When a check is presented for payment through the check-collection system, the drawee bank, i.e., the one ordered to make payment of the check, normally makes settlement for the amount of the check to the presenting bank (here the drawee bank is Venice's bank in Florida and the presenting bank is Hocking Valley). Under R.C. 1304.27 and UCC 4–301, the drawee bank may recover the settlement if it returns the check within its midnight deadline. In that case the check is not paid and dishonor occurs under R.C. 1303.62(B)(1). If the drawee bank does not return the check or give notice of dishonor within the midnight deadline, the settlement becomes final and there can be no dishonor. See R.C. 1303.62, U.C.C. Official Comment 4.

{¶ 40} R.C. 1303.65, "evidence of dishonor" reveals that R.C. 2913.11(B) does not apply to Terry's conduct. R.C. 1303.65(A)(2) indicates that a stamp or writing of the drawee bank stating that acceptance or payment has been refused constitutes evidence of dishonor "unless reasons for the refusal" are inconsistent with dishonor. The Official Comment to R.C. 1303.65 states:

> Thus the following reasons for refusal are not evidence of dishonor, but of justifiable refusal to pay or accept:
> * * *
> Forgery
> Payee altered

\* \* \*

On the other hand the following reasons are satisfactory evidence of dishonor, consistent with due presentment, and are within this provision:
Not sufficient funds
\* \* \*

No account
Payment stopped

 {¶ 41} When reading these sections together, it becomes clear that the purpose behind R.C. 2913.11(B) is not to punish forgery or the alteration of genuine checks. Rather, it is to punish the issuance of checks that are bogus or worthless because there are no funds available to pay them. The essence of the crime of passing bad checks is to prohibit anyone from issuing or transferring a check to obtain money or property when that individual knows that the check is worthless. See generally Reasonable Expectation of Payment as Affecting Offense under "Worthless Check" statutes (1966), 9 A.L.R.3d 719, Section 1. See also Constitutionality of "Bad Check" Statute (1982), 16 A.L.R.4th 631, Section 2.

{¶ 42} Our conclusion that Ohio's bad-check statute is not designed to address forgery or alteration of genuine drafts is also supported by the comments to the Model Penal Code, which appears to be the basis for R.C. 2913.11(B). Section 224 of the Model Penal Code addresses the basic forgery offense and a series of other provisions "relating to different forms of fraudulent behavior." See Model Penal Code, Sections 224.1–224.14, note. The provisions addressing forgery are located in Section 224.1, while the passing-bad-checks prohibition is contained in Section 224.5. The explanatory note makes it clear that forgery and passing worthless paper are different crimes. Like Ohio's law, the Model Code also makes it clear that the essence of the crime of passing bad checks is issuing or transferring a check when the person knows it will not be paid because there are no funds available within the system to satisfy it; i.e., it is bogus.

{¶ 43} Thus, we conclude that the passing-bad-check statute is designed to prohibit a narrow class of actions. The statute requires knowledge that the check "will be dishonored." Thus, even if there was sufficient evidence to show that Terry knew the check was a forgery and was not properly payable, there was insufficient evidence to show that Terry knew (1) that the check was written on a nonexistent account, (2) that there were insufficient funds in the account to pay the check, or (3) that anyone would realize that the payee's name had been forged and order stop payment. And in fact, Terry's scheme depended upon the check being successfully negotiated and honored, a sequence of events that unfortunately occurred.

{¶ 44} In this case, the state needed to present evidence sufficient to permit jurors to conclude that Terry knew that the check would be dishonored. Even

when viewed in a light most favorable to the prosecution, that circumstantial evidence here is clearly lacking. His scheme required the payee bank to honor the check, even though it was a forgery. Accordingly, we reverse Terry's conviction for passing bad checks.[2]

### C. Specification to forgery count

{¶ 45} Terry further contends that there was insufficient evidence to support the specification stating that he was in possession of $3,375 cash and an $18,700 cashier's check on the date he deposited the forged check. Police actually seized these items on the date of Terry's arrest in December, weeks after he deposited the check in Albany.

{¶ 46} However, there is no merit to his argument. Our review of the record and the judgment entry indicates that the jury did not issue a finding on the specification. In fact, Terry stipulated on the record before closing arguments that the cash and cashier's check could be forfeited to the state and used to pay back the victim or victims of the offense. Accordingly, the jury was not instructed on the specification to count three. The verdict forms show that the jury found Terry guilty only of the offense of forgery, a violation of R.C. 2913.31(A)(3). And this fact is further confirmed by the judgment entry, which states that Terry was found guilty only of one count of forgery and that "[d]efendant did stipulate that the $3,375.00 cash and the $18,700.00 cashier's check should be returned to the victims."

### IV. Manifest Weight of the Evidence

{¶ 47} Terry asserts that his convictions for theft, forgery, and receiving stolen property are against the manifest weight of the evidence. Terry also challenged the weight of the evidence for his conviction for passing bad checks. As stated in section III, we are reversing that conviction as unsupported by legally sufficient evidence. Thus we decline to reexamine it here.

{¶ 48} In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. A reviewing court "may not reverse a conviction when

---

2. This is not to say that Terry could not be properly charged with other forms of theft or fraud in connection with negotiating this check. In fact, he was convicted of forgery.

there is substantial evidence upon which the trial court could reasonably conclude that all elements of the offense have been proven beyond a reasonable doubt." *State v. Johnson* (1991), 58 Ohio St.3d 40, 42, 567 N.E.2d 266, citing *State v. Eskridge* (1988), 38 Ohio St.3d 56, 526 N.E.2d 304, at paragraph two of the syllabus.

{¶ 49} Even in our role as a 13th juror, we are constrained by the rule that the weight to be given evidence and the credibility to be afforded testimony are issues normally to be determined by the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, at paragraph one of the syllabus. The fact-finder "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. Thus, we will only interfere if the fact-finder clearly lost its way and created a manifest miscarriage of justice.

{¶ 50} Terry sets forth no new arguments in his challenge to the manifest weight of the evidence. Again, he claims that evidence presented at trial wholly failed to establish that the state proved that he acted knowingly with respect to any of the crimes for which he was convicted.

{¶ 51} We have reviewed the entire record of proceedings that was before the trial court. Although Terry's knowledge had to be inferred from circumstantial evidence, we are not convinced that Terry's convictions for grand theft, forgery, and receiving stolen property were ultimately against the manifest weight of the evidence. The jurors' conclusions regarding Terry's knowledge are supported by the totality of circumstantial evidence as explained in Section III(A). This is not one of those rare cases when the evidence weighs so heavily against the conviction that we would find ourselves reversing the fact-finder's decision. For the same reasons that we determined that the state presented sufficient evidence in this case, we hold that there is substantial evidence that the jurors could have reasonably interpreted as proof of Terry's acting knowingly with regard to the crimes of which he was convicted.

## V. Conclusion

{¶ 52} For the foregoing reasons we affirm Terry's convictions for theft, forgery, and receiving stolen property. We reverse Terry's conviction for passing bad checks as unsupported by the evidence.

Judgment affirmed in part and
reversed in part,
and cause remanded.

ABELE and KLINE, JJ., concur.