[Cite as *State v. Suffel*, 2015-Ohio-222.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PAULDING COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,             CASE NO.  11-14-05

    v.

CHRISTOPHER D. SUFFEL,          O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Paulding County Common Pleas Court
Trial Court No. CR-13-568

**Judgment Affirmed**

Date of Decision:  January 26, 2015

APPEARANCES:

    *Harvey D. Hyman* for Appellant

    *Joseph R. Burkard*  for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Christopher D. Suffel ("Suffel"), appeals the May 14, 2014 judgment entry of sentence of the Paulding County Court of Common Pleas. He argues that his convictions are against the manifest weight of the evidence, that the trial court erred in overruling his Crim.R. 29 motions for acquittal, and that the trial court erred in refusing his requested jury instruction regarding "accident." For the reasons that follow, we affirm.

{¶2} On September 10, 2013, the Paulding County Grand Jury indicted Suffel on Counts One, Two, and Three of forgery in violation of R.C. 2913.31(A)(3), fifth-degree felonies. (Doc. No. 1). Count One stemmed from an August 6, 2013 incident in which Suffel allegedly produced a counterfeit $100 bill to the clerk at the Valero store in Paulding, Ohio to pay for miscellaneous items. (Doc. No. 14). Counts Two and Three stemmed from August 6, 2013 incidents in which Suffel allegedly produced two counterfeit $50 bills and a counterfeit $100 bill, respectively, at the Eagles in Paulding, Ohio to pay for lottery tickets. (*Id.*).

{¶3} On April 1, 2014, a jury trial was held on the indictment. (Apr. 1, 2014 Tr. at 5). The jury found Suffel guilty of all three counts in the indictment. (*Id.* at 170-171); (Doc. No. 46).

{¶4} The trial court held a sentencing hearing on May 12, 2014 and sentenced Suffel to eight months imprisonment on each count, to be served

consecutively for an aggregate prison term of 24 months. (May 12, 2014 Tr. at 9). The trial court filed its judgment entry of sentence on May 14, 2014. (Doc. No. 47).

{¶5} On June 12, 2014, Suffel filed a notice of appeal. (Doc. No. 49). He raises three assignments of error for our review. We will address Suffel's first and second assignments of error together, followed by his third assignment of error.

### Assignment of Error No. I

**The verdict and the conviction of the appellant as to Counts I and II of the indictment were against the manifest weight of the evidence. (T. at pp. 170-171)**

### Assignment of Error No. II

**The trial court erred in overruling the defendant's Rule 29 motions for acquittal. (T. at pp. 123 and 137)**

{¶6} In his first assignment of error, Suffel argues that his convictions for Counts One and Two are against the manifest weight of the evidence.[1] Specifically, he argues that the State presented no evidence "of any purpose to defraud on the part of [Suffel]" or "to support an inference that [Suffel] knew the two $50.00 bills were forged, nor that [Suffel] knew the $100.00 bill was forged when he first presented it at Valero." (Appellant's Brief at 3). In his second

---

[1] Under his first assignment of error, Suffel does not argue that his conviction for Count Three is against the manifest weight of the evidence. However, under his second assignment of error, Suffel disputes the trial court's overruling his Crim.R. 29 motions for acquittal, in which Suffel challenged each of the three counts in the indictment. (*See* Apr. 1, 2014 Tr. at 120).

-3-

assignment of error, Suffel argues that the trial court erred in overruling his Crim.R. 29 motions for acquittal, which he made at the close of the State's and his cases at trial. Specifically, he argues that "the State failed to demonstrate [Suffel]'s purpose to defraud and his knowledge of the fact the bills were forged, both essential elements of the charges." (*Id.* at 5).

{¶7} Crim.R. 29(A) provides that a court must order the entry of a judgment of acquittal of a charged offense "if the evidence is insufficient to sustain a conviction of such offense." However, "a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman*, 55 Ohio St.2d 261 (1978), syllabus. "The *Bridgeman* standard 'must be viewed in light of the sufficiency of evidence test[.]'" *State v. Hansen*, 3d Dist. Seneca No. 13-12-42, 2013-Ohio-1735, ¶ 35, quoting *State v. Foster*, 3d Dist. Seneca No. 13-97-09, 1997 WL 576353, *2 (Sept. 17, 1997). *See also State v. Perkins*, 3d Dist. Hancock No. 5-13-01, 2014-Ohio-752, ¶ 28 ("[A] motion for acquittal tests the sufficiency of the evidence."), citing *State v. Tatum*, 3d Dist. Seneca No. 13-10-18, 2011-Ohio-3005, ¶ 43.

{¶8} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at

trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶9} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that

-5-

the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶10} Suffel was convicted of three counts of forgery in violation of R.C. 2913.31(A)(3). That statute provides, "No person, with purpose to defraud, or knowing that the person is facilitating a fraud, shall * * * [u]tter, or possess with purpose to utter, any writing that the person knows to have been forged." R.C. 2913.31(A)(3). Under his first and second assignments of error, Suffel disputes only the "purpose to defraud" and "knows to have been forged" elements of forgery set forth in R.C. 2913.31(A)(3). Therefore, we will limit our review under Suffel's first and second assignments of error to only those elements. *See State v. Alexander*, 8th Dist. Cuyahoga No. 85688, 2005-Ohio-5200, ¶ 34.

{¶11} "'Defraud' means to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to

another." R.C. 2913.01(B). "'Forge' means to fabricate or create, in whole or in part and by any means, any spurious writing, or to make, execute, alter, complete, reproduce, or otherwise purport to authenticate any writing, when the writing in fact is not authenticated by that conduct." R.C. 2913.01(G).[2]

**{¶12}** To be convicted of violating R.C. 2913.31(A)(3), a person must act "with *purpose* to defraud" or "*knowing* that the person is facilitating a fraud." (Emphasis added.) R.C. 2913.31(A)(3). To defraud, one must act "knowingly." R.C. 2913.01(B). "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). *See also State v. Fugate*, 2d Dist. Montgomery No. 25782, 2014-Ohio-415, ¶ 24. "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). *See also State v. Windle*, 11th Dist. Lake No. 2010-L-033, 2011-Ohio-4171, ¶ 31.

---

[2] Although Suffel does not dispute the "[u]tter, or possess with purpose to utter" element set forth in R.C. 2913.31(A)(3), "'[u]tter' means to issue, publish, transfer, use, put or send into circulation, deliver, or display." R.C. 2913.01(H).

**{¶13}** A jury may infer from circumstantial evidence that a defendant acted purposely or knowingly. *State v. Jenkins*, 4th Dist. Lawrence No. 05CA7, 2006-Ohio-2546, ¶ 27, citing *State v. Shue*, 97 Ohio App.3d 459, 466 (9th Dist.1994); *State v. Sidders*, 3d Dist. Union No. 14-08-24, 2009-Ohio-409, ¶ 26, citing *State v. Buelow*, 10th Dist. Franklin Nos. 07AP-317 and 07AP-318, 2007-Ohio-5929, ¶ 25; *State v. Terry*, 186 Ohio App.3d 670, 2010-Ohio-1604, ¶ 22 (4th Dist.), citing *State v. Seiber*, 56 Ohio St.3d 4, 13-14 (1990); *State v Coats*, 3d Dist. Hancock No. 5-90-48, 1991 WL 218054, *2 (Aug. 29, 1991), citing *State v. Bradley*, 26 Ohio App.2d 229 (4th Dist.1971). *See also Fugate* at ¶ 25. In fact, "because the fact-finder is incapable of peering into the mind of the criminal defendant," the defendant's mental state can often be established only by circumstantial evidence. *Terry* at ¶ 22, citing *State v. Adams*, 4th Dist. Ross No. 94CA2041, 1995 WL 360247, *4 (June 8, 1995). "If the defendant does not testify as to his state of mind, the fact-finder must decide what his intent is by looking at the surrounding facts and circumstances." *Id.*, citing *State v. Lott*, 51 Ohio St.3d 160, 168 (1990). "Moreover, a series of facts and circumstances can be employed by a jury as the basis for the ultimate conclusion in a case." *State v. Gowins*, 5th Dist. Stark No. 2007-CA-00170, 2008-Ohio-440, ¶ 24, citing *Lott* at 168.

**{¶14}** At trial, the State offered the testimony of Louis Johns ("Johns") of the United States Secret Service. (Apr. 1, 2014 Tr. at 54). He identified State's Exhibit 1 as a counterfeit $100 bill and State's Exhibits 2 and 3 as counterfeit $50 bills. (*Id.* at 57-64). On cross-examination, Johns admitted that "[t]here are times when individuals do not know they have" counterfeit currency in their possession. (*Id.* at 64-65). He also agreed that "[i]t's not uncommon" for people "to be duped by fake currency." (*Id.* at 65).

**{¶15}** The State also called Robin McCord ("McCord"), who on the date of the alleged offenses, August 6, 2013, was employed as a cashier at the Valero gas station in Paulding. (*Id.* at 68-69). She testified that around 10 or 11 o'clock in the morning that day, Suffel gave her a $100 bill that "had a blue tint" and "a funny look" to pay for his purchases. (*Id.* at 70-71). According to McCord, she used a counterfeit pen to determine the bill was counterfeit. (*Id.*). McCord described how Suffel reacted when she told him that the bill was counterfeit:

I think he said, WTF, but used the words.

* * *

And he was visibly agitated, he was mad, you know. And then I showed it to him because I wanted him to know I wasn't lying, and he grabbed it from me, and he paid for his purchases and left.

(*Id.*). McCord also testified, "I believe he told me that he had * * * sold some speakers or something on eBay or from somebody, and they gave him the money." (*Id.* at 72). McCord identified State's Exhibit 1 as the counterfeit $100 bill that Suffel handed to her. (*Id.* at 72-73). McCord called the police and informed them of what happened. (*Id.* at 73).

{¶16} On cross-examination, McCord explained that after she discovered and told Suffel that the $100 bill was counterfeit, "he immediately grabbed money out of his pocket" and replaced it with a $100 bill that McCord marked twice with the counterfeit pen to confirm it was not counterfeit. (*Id.* at 76-77). She also testified that Suffel "wanted to see the mark" that she made on the counterfeit bill with the counterfeit pen, so she showed it to him. (*Id.* at 77).

{¶17} The State called Sarah Kurtz ("Kurtz") who on August 6, 2013 was employed at the Eagles in Paulding. (*Id.* at 79). She testified that "maybe between 1:30, 2:30" that day, Suffel, who is a "regular" at the Eagles, came in and played "pull-off tickets," which are games of chance. (*Id.* at 80-82). According to Kurtz, Suffel handed her a $50 bill that "felt different than a usual 50," but she "dismissed that thought" because he was "a regular with his father." (*Id.* at 81). Kurtz testified that Suffel left the Eagles, and when he did, she "had two $50 bills in [her] ticket drawer from him because he was the only one playing tickets at that time." (*Id.*). Suffel used the $50 bills to pay for the pull-off tickets. (*Id.* at 82).

According to Kurtz, the Eagles at that time did not have a counterfeit pen to check bills. (*Id.*).

{¶18} Kurtz testified that Suffel came back to the Eagles "a couples hours after his first time in," sometime between four and six o'clock, and again played pull-off tickets. (*Id.* at 83-84). According to Kurtz, Suffel handed her a $100 bill to pay for $20 worth of tickets, and "that bill felt the same as the 50," which was more "like a paper, like a textile" than a regular bill. (*Id.* at 84). Kurtz "instantly put it up to the light, and there was no * * * identifying strip that a $100 bill should have." (*Id.* at 85). Kurtz also observed that the $100 bill had a marking from an "identifying pen." (*Id.* at 89). She gave the $100 bill back to Suffel and told him he needed to take it "back to the bank because it's not right." (*Id.* at 85). According to Kurtz, Suffel "still wanted to play the $20 of tickets," so he gave her a regular $20 bill. (*Id.* at 87).

{¶19} Kurtz testified that at that point, she "realize[d] that the two $50 bills that [were] in [her] ticket drawer, more than likely [were] fake as well." (*Id.* at 86). According to Kurtz, she determined that the two $50 bills that Suffel gave her earlier in the day were counterfeit after comparing them with another $50 bill that a patron used to buy tickets between Suffel's visits to the Eagles. (*Id.* at 86-87). According to Kurtz, the two $50 bills had the same serial number and "were not the same length and the same width" as the $50 bill from the other

patron. (*Id.* at 87, 89). Kurtz identified State's Exhibit 1 as the $100 bill and State's Exhibits 2 and 3 as the two $50 bills that Suffel handed to her. (*Id.* at 88-90). Kurtz testified that she was terminated from her employment at the Eagles following "a situation in October concerning Keno and tickets being played." (*Id.* at 92).

{¶20} On cross-examination, Kurtz testified that Suffel "would usually come in a few times a week," and on none of those other occasions did she come across money that she estimated to be counterfeit. (*Id.* at 94). According to Kurtz, on August 6, 2013, Suffel paid with bills other than the counterfeit bills. (*Id.* at 94-95). Kurtz determined that other currency with which Suffel paid that day was genuine. (*Id.* at 95-96). Kurtz made change for Suffel earlier on August 6, 2013. (*Id.* at 96). Kurtz admitted that after Suffel handed it to her, she showed the $100 bill to another patron who "was fooled" by the bill and did not think it was counterfeit. (*Id.* at 98). When Suffel's counsel asked Kurtz if she has ever stolen anything, she responded, "I have been charged in the past, yes." (*Id.* at 99). Suffel's counsel asked Kurtz about the termination of her employment at the Eagles, and she explained, "It was an issue of playing Keno tickets after hours at the Eagles." (*Id.* at 99-100). Kurtz admitted that she was subsequently hired by another establishment, Three Brothers, but she refused to go back to work after four weeks when Three Brothers attempted to withhold her checks, citing a

"similar incident" to what happened at the Eagles, which was, in Kurtz's words, "an influx in Keno sales." (*Id.* at 100-101).

{¶21} The State offered the testimony of Officer Regina Weidenhamer ("Weidenhamer") of the Paulding Police Department. (*Id.* at 103). She testified that when she arrived for her shift at 2:00 p.m. that day, she had a note on her desk "to go to the Valero in reference to counterfeit money." (*Id.* at 103-104). According to Weidenhamer, she responded to Valero where she learned after speaking with McCord and watching the store's surveillance video that Suffel presented a $100 bill at the store that McCord determined was counterfeit. (*Id.* at 104-105). Weidenhamer testified that the store's surveillance video showed the clerk marking the $100 bill and giving it back to Suffel. (*Id.* at 107).

{¶22} Weidenhamer testified that about two hours after she was at Valero, she received a call from the Eagles in reference to counterfeit money. (*Id.* at 105-106). At the Eagles, Weidenhamer learned from Kurtz that Suffel had been in earlier in the day and presented two $50 bills, then came in later and presented a $100 bill, and Kurtz suspected that all three bills were counterfeit. (*Id.* at 106). Weidenhamer testified that she then questioned Suffel, who was still at the Eagles. (*Id.* at 107). According to Weidenhamer, Suffel admitted that he had been to Valero, but when she asked him "about the $100 bill that he had presented to Valero at first," he denied that he presented a counterfeit $100 bill at Valero and

said "that no one had told him that" the $100 bill was counterfeit. (*Id.* at 107, 113). Weidenhamer testified that when she asked Suffel "where he received the money," Suffel told her that Dusty Dobbelaere ("Dobbelaere") gave him the money. (*Id.* at 107). According to Weidenhamer, Suffel at first did not tell her why Dobbelaere gave him the counterfeit money, but then he said Dobbelaere gave him the counterfeit money when Suffel sold him a speaker. (*Id.* at 107-108). Weidenhamer identified State's Exhibit 1 and State's Exhibits 2 and 3 as the $100 bill that she got from Suffel and the two $50 bills that Kurtz gave her, respectively. (*Id.* at 108).

{¶23} On cross-examination, Weidenhamer testified that she was not present when Suffel presented the bills on August 6, 2013. (*Id.* at 110). She testified that she asked Valero for a copy of the surveillance video, but Valero "failed to do so." (*Id.* at 111). Weidenhamer testified that when she was speaking with Suffel at the Eagles, "he said he would pay for everything, he would make it right, and he pulled out a $100 bill which [Weidenhamer] looked at, checked, and it was a good $100 bill, and that was returned to the Eagles." (*Id.*). When asked by Suffel's counsel, Weidenhamer admitted that she has no evidence that Suffel "had a printing press running, was counterfeiting bills, or anything like that." (*Id.* at 112). Aside from "the testimony of the witnesses," Weidenhamer had no way

to verify that the $100 bill that Suffel presented at Valero was the same $100 bill he presented at the Eagles. (*Id.* at 113).

{¶24} The State's final witness was Dobbelaere,[3] who testified that he knows Suffel from high school but has had no interaction with him since his sophomore year of high school, in 2000. (*Id.* at 115-116). Dobbelaere testified that he did not purchase speakers from Suffel and that he never gave Suffel money for speakers. (*Id.* at 116).

{¶25} At the State's request, the trial court admitted State's Exhibits 1, 2, and 3 without objection from Suffel, and the State rested. (*Id.* at 117-118). Suffel moved for acquittal under Crim.R. 29, arguing that the State failed to establish that Suffel knew the bills were counterfeit when he presented them. (*Id.* at 120-121, 122-123). The trial court overruled Suffel's Crim.R. 29 motion. (*Id.* at 123).

{¶26} Suffel called one witness, Dennis Price ("Price"), the trustee's secretary for the Eagles in Paulding, in an attempt to discredit Kurtz. (*Id.* at 129-130). According to Price, when Kurtz was employed at the Eagles, "she was playing the Ohio Lottery, Keno, during periods where she was off duty at night." (*Id.* at 131). Price testified that as a result of Kurtz's employment with the Eagles, he had a reason to distrust her. (*Id.* at 132).

---

[3] In its brief, the State asserts that Suffel told Weidenhamer that he sold speakers to "Dustin Ripke." (Appellee's Brief at 2). Our review of the record does not reveal any mention of a "Dustin Ripke," and it appears that the State meant to refer instead to "Dustin Dobbelaere."

{¶27} Suffel rested, and the State did not present any rebuttal evidence. (*Id.* at 133). Suffel again moved for acquittal under Crim.R. 29, arguing that the State failed to offer evidence as to Suffel's intent. (*Id.* at 134). The trial court overruled Suffel's Crim.R. 29 motion. (*Id.* at 137).

{¶28} We first address Suffel's argument that the trial court improperly denied his Crim.R. 29 motions for acquittal, which concerns the sufficiency of the evidence. *See State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999). Viewing the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could have found the "purpose to defraud" and "knows to have been forged" elements of forgery, set forth in R.C. 2913.31(A)(3), proven beyond a reasonable doubt.

{¶29} The evidence revealed that on August 6, 2013, Suffel first went to Valero, where the cashier told him that his $100 bill was counterfeit. After that, Suffel went to the Eagles on two occasions and presented counterfeit bills, including a counterfeit $100 bill that bore a mark from a counterfeit pen. The evidence presented suggests that Suffel knew he was in possession of a counterfeit $100 bill. McCord identified State's Exhibit 1 as the counterfeit $100 bill that she marked and handed back to Suffel. Kurtz identified that same exhibit as the counterfeit $100 bill that Suffel handed to her. Moreover, according to McCord

-16-

and Kurtz, the counterfeit bills that Suffel presented were noticeably different than genuine bills. McCord described the $100 bill as having "a blue tint" and "a funny look." Kurtz described the bills as feeling different than genuine bills, lacking security features, and being different sizes than genuine bills.

{¶30} Most significantly, the evidence viewed in a light most favorable to the prosecution demonstrates that Suffel told Weidenhamer at least two lies, which suggested that Suffel knew the bills were counterfeit and that Suffel had the purpose to defraud Valero and the Eagles. First, Suffel denied to Weidenhamer that he presented a counterfeit $100 bill at Valero and denied that the Valero cashier told him the bill was counterfeit. Second, Suffel told Weidenhamer that he got the counterfeit money from Dobbelaere in exchange for a speaker. The jury was free to infer consciousness of guilt from Suffel's dishonesty. *State v. Brodbeck*, 10th Dist. Franklin No. 08AP-134, 2008-Ohio-6961, ¶ 44 ("The jury was at liberty to infer consciousness of guilt from appellant's lie."), citing *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, ¶ 54, citing *State v. Johnson*, 46 Ohio St.3d 96, 100 (1989).

{¶31} We conclude that the trial court did not err in overruling Suffel's Crim.R. 29 motions for acquittal because a rational trier of fact could have found that Suffel knew the bills were counterfeit and that he acted with the purpose to

defraud Valero and the Eagles because he specifically intended to obtain, by using counterfeit bills, a benefit for himself to the detriment of Valero and the Eagles.

{¶32} We next address Suffel's arguments that his convictions for Counts One and Two are against the manifest weight of the evidence. In addition to arguing that the State failed to present evidence that he knew the bills were counterfeit or that he acted with purpose to defraud, Suffel points to Johns's testimony on cross-examination that people are often duped by counterfeit currency and sometimes possess it unknowingly. Suffel also argues that Kurtz's testimony was not credible. Kurtz admitted that she had stolen in the past and that her being fired from the Eagles stemmed from "an issue of playing Keno tickets after hours." Price testified that as a result of Kurtz's employment at the Eagles, he had a reason to distrust her.

{¶33} Even removing the lens of favorability in favor of the prosecution, through which we examine the sufficiency of the evidence, this is not an exceptional case where the evidence weighs heavily against the convictions. While Johns testified that people can be fooled by counterfeit currency, McCord and Kurtz described the noticeably suspicious nature of the bills that Suffel handed to them. And while Kurtz's credibility may have been questionable, the jury observed her testimony and Price's testimony, and we are mindful of the jury's "superior, first-hand perspective in judging the demeanor and credibility of

witnesses." *State v. Phillips*, 10th Dist. Franklin No. 14AP-79, 2014-Ohio-5162, ¶ 125, citing *DeHass*, 10 Ohio St.2d 230, at paragraph one of the syllabus.

{¶34} The evidence weighing in favor of Suffel's convictions is much weightier than the evidence weighing against them. Most significant is Suffel's apparent untruthfulness to Weidenhamer. Also significant is the timing of the events. Suffel attempted to pay for $20 worth of pull-off tickets at the Eagles with a $100 bill that McCord had earlier that day marked with a counterfeit pen. When the pen revealed that the bill was counterfeit, McCord told Suffel that the $100 bill he presented to her was counterfeit. This is perhaps why Suffel does not argue that his conviction for Count Three—which was based on his attempt to pay with the counterfeit $100 bill at the Eagles—is against the manifest weight of the evidence. What Suffel discounts, however, is that evidence related to Count Three is also evidence that he knew the $100 bill he presented at Valero and the two $50 bills he presented at the Eagles were counterfeit and that he acted with the purpose to defraud those establishments.

{¶35} For these reasons, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that Suffel's convictions for Counts One and Two must be reversed and a new trial ordered.

{¶36} Suffel's first and second assignments of error are overruled.

## Assignment of Error No. III

**The trial court erred in refusing the defendant's requested jury instruction of accident. (t. [sic] at p. 140)**

{¶37} In his third assignment of error, Suffel argues that the trial court erred by denying his request for the "accident" jury instruction found in *Ohio Jury Instructions*, CR Section 421.01 (1983). Suffel argues that he established through Johns, the State's expert witness concerning counterfeit money, "that accidental passing of counterfeit bills often occurs." (Appellant's Brief at 6). Suffel also argues that the testimony of Weidenhamer, the investigating officer, "showed that the defendant never admitted knowing that the bills he passed that night were counterfeit." (*Id.*). Finally, he argues that "there was evidence presented that [he] denied knowing that the bills were counterfeit to both the cashier at the Valero convenience store, as well as to the bar-tender [sic] at The Eagles." (*Id.* at 7).

{¶38} "'When reviewing a court's refusal to give a requested jury instruction, an appellate court considers whether the trial court's refusal to give said instruction was an abuse of discretion under the facts and circumstances of the case.'" *State v. Simonis*, 3d Dist. Seneca No. 13-14-05, 2014-Ohio-5091, ¶ 31, quoting *State v. Kunz*, 6th Dist. Wood No. WD-10-047, 2011-Ohio-3115, ¶ 30, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable.

*State v. Adams*, 62 Ohio St.2d 151, 157 (1980). "Generally, a trial court must provide the jury with all instructions that are relevant and necessary to weigh the evidence and discharge their duties as the fact finders." *State v. Sunderman*, 5th Dist. Stark No. 2006-CA-00321, 2008-Ohio-3465, ¶ 21, citing *State v. Joy*, 74 Ohio St.3d 178, 181 (1995). However, "a court need not instruct the jury as a party requests if 'the evidence adduced at trial is legally insufficient' to support it." *State v. Juntunen*, 10th Dist. Franklin Nos. 09AP-1108 and 09AP-1109, 2010-Ohio-5625, ¶ 13, quoting *State v. Barnd*, 85 Ohio App.3d 254, 259 (3d Dist.1993). "The trial court possesses the discretion 'to determine whether the evidence presented at trial is sufficient to require that [the] instruction be given.'" *Id.*, quoting *State v. Lessin*, 67 Ohio St.3d 487, 494 (1993).

**{¶39}** "'Accident is that which is unintentional and unwilled and implies a lack of criminal culpability.'" *State v. Vintson*, 9th Dist. Lorain No. 06CA009066, 2007-Ohio-6141, ¶ 31, quoting *State v. Ross*, 135 Ohio App.3d 262, 276 (12th Dist.1999). The *Ohio Jury Instructions* section containing the "accident" jury instruction that Suffel requested provides, in part:

1. The defendant denies any purpose to (*describe*). He denies that he committed an unlawful act and says that the result was accidental.

2. DEFINED. An accidental result is one that occurs unintentionally and without any design or purpose to bring it about.

-21-

> An accident is a mere physical happening or event, out of the usual order of things and not reasonably (anticipated) (foreseen) as a natural or probable result of a lawful act.

(Emphasis sic.) *Ohio Jury Instructions*, CR Section 421.01 (1983).

**{¶40}** In denying Suffel's request for the "accident" jury instruction, the trial court concluded that there was no evidence "that would support rendering an instruction like this." (Apr. 1, 2014 Tr. at 140). After reviewing the record, we agree that the evidence was insufficient to support an "accident" instruction and conclude that the trial court did not abuse its discretion in refusing to provide an "accident" instruction to the jury. *See Sunderman* at ¶ 25.

**{¶41}** First, Suffel's reliance on Johns's testimony that it is not uncommon for people to unknowingly possess counterfeit currency is misplaced. Johns did not testify that *Suffel* lacked a purpose to defraud or otherwise presented the counterfeit bills accidentally, and Suffel overlooks the subjective elements of the accident instruction. *See State v. Wegmann*, 3d Dist. Allen No. 1-06-98, 2008-Ohio-622, ¶ 112. Second, Suffel's argument that Weidenhamer's testimony "showed that the defendant never admitted knowing that the bills he passed that night were counterfeit" also misses the mark. A lack of admission by Suffel to law enforcement does not equate to a denial, for purposes of the "accident" jury instruction, that he acted without purpose to defraud. Finally, Suffel improperly

relies on McCord's and Kurtz's testimony that Suffel denied knowing the bills he gave them were counterfeit. This testimony is overshadowed by the evidence that we discussed in addressing Suffel's first and second assignments of error, which demonstrates that Suffel's presentation of the counterfeit bills was not an accident and that he in fact acted with the purpose to defraud Valero and the Eagles.

{¶42} What is more, the record reflects that the trial court instructed the jury that to find Suffel guilty of the forgery counts, it had to find beyond a reasonable doubt that he acted "with purpose to defraud, or knowing that he was facilitating a fraud." (Apr. 1, 2014 Tr. at 158-159). The trial court instructed the jury concerning the definition of "defraud" and what it means to act "purposely" and "knowingly." (*Id.* at 159-160). "Therefore, '[t]he absence of accident was necessarily part of the instructions that were delivered by the trial court.'" *State v. Fogler*, 9th Dist. Medina 08CA0004-M, 2008-Ohio-5927, ¶ 16, quoting *State v. Staats*, 9th Dist. Summit No. 15706, 1994 WL 122266, *5 (Apr. 13, 1994). In other words, the trial court instructed the jury that, to find Suffel guilty of forgery, it had to find that he acted purposely or knowingly; therefore, had the jury found that Suffel lacked the requisite mental state and that the results of his actions were accidental, the jury would have been required to find Suffel not guilty under the trial court's general instruction. *State v. Hubbard*, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735, ¶ 61, citing *State v. Johnson*, 10th Dist. Franklin No. 06AP-

878, 2007-Ohio-2792, ¶ 63, *State v. Manbevers*, 4th Dist. Pickaway No. 93CA23, 1994 WL 529966 (Sept. 28, 1994), and *Fogler* at ¶ 16.

{¶**43**} For these reasons, the trial court did not abuse its discretion when it refused to instruct the jury concerning "accident."

{¶**44**} Suffel's third assignment of err or is overruled.

{¶**45**} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**