[Cite as *State v. Coleman*, 2018-Ohio-1681.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                  CASE NO. 8-17-50

      v.

ZACKARIAH J. COLEMAN,           O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Logan County Common Pleas Court
Trial Court No. CR16-10-0296

**Judgment Affirmed**

Date of Decision:   April 30, 2018

APPEARANCES:

    *Linda Gabriele* **for Appellant**

    *Alice Robinson-Bond* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Zackariah J. Coleman ("Coleman"), appeals the November 20, 2017 judgment entry of sentence of the Logan County Court of Common Pleas. We affirm.

{¶2} This case stems from allegations that Coleman sexually abused S.E.—the daughter of his girlfriend with whom Coleman shared a home—between 2014 and 2015, while S.E. was less than thirteen years of age. On November 8, 2016, the Logan County Grand Jury indicted Coleman on three counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), third-degree felonies. (Doc. No. 4). On November 16, 2016, Coleman appeared for arraignment and entered pleas of not guilty. (Doc. No. 10).

{¶3} The case proceeded to a jury trial on September 26 and 27, 2017. (Sept. 26, 2017 Tr., Vol. I, at 1); (Sept. 27, 2017, Vol. II, at 156). On September 27, 2017, the jury found Coleman guilty of one count of gross sexual imposition. (Sept. 27, 2017 Tr., Vol. II, at 226-227); (Doc. No. 106). The jury could not reach a unanimous verdict as to the other two counts of the indictment. (Sept. 27, 2017 Tr., Vol. II, at 226-227); (Doc. No. 110). The trial court filed its judgment entry of conviction on October 2, 2017 finding Coleman guilty of one count of gross sexual imposition and dismissing the other two counts of the indictment. (Doc. No. 110).

{¶4} The trial court held a sentencing and a sex-offender registration hearing on November 2, 2017. (Nov. 2, 2017 Tr. at 1); (Doc. No. 114). The trial court sentenced Coleman to five years of community control. (*Id.* at 8); (*Id.*). The trial court also classified Coleman as a Tier II sex offender. (*Id.* at 3); (*Id.*). The trial court filed its judgment entries of sentence and sex-offender classification on November 20, 2017. (Doc. No. 114).

{¶5} Coleman filed a notice of appeal on November 28, 2017. (Doc. No. 118). He raises two assignments of error for our review, which we discuss together.

**Assignment of Error No. I**

**The Verdict of the Trial Court was Not Supported by Sufficient Evidence as the State of Ohio Failed to Prove Each and Every Element of the Crime of Gross Sexual Imposition Beyond a Reasonable Doubt.**

**Assignment of Error No. II**

**The Verdict of the Trial Court was Against the Manifest Weight of the Evidence as the State of Ohio Failed to Prove Each and Every Element of the Crime of Gross Sexual Imposition Beyond a Reasonable Doubt.**

{¶6} In his assignments of error, Coleman argues that his gross-sexual-imposition conviction is based on insufficient evidence and is against the manifest weight of the evidence.

**{¶7}** Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). As such, we address each legal concept individually.

**{¶8}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

{**¶9**} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{**¶10**} R.C. 2907.05 sets forth the offense of gross sexual imposition and provides, in relevant part:

> (A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

\* \* \*

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

R.C. 2907.05(A)(4).  "In order to prove the offense of gross sexual imposition [under R.C. 2907.05(A)(4)], 'the State must prove that the defendant had sexual contact with a person, not the defendant's spouse, and that the contact was with a person under the age of thirteen, whether the defendant knew the age of the person or not.'"  *State v. Jones*, 2d Dist. Montgomery No. 26289, 2015-Ohio-4116, ¶ 43, quoting *State v. Israel*, 2d Dist. Miami No. 09-CA-47, 2010-Ohio-5044, ¶ 25.  "The term 'sexual contact' is defined as 'any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.'"  *Id.*, quoting R.C. 2907.01(B).  "'"[T]here is no requirement that there be direct testimony regarding sexual arousal or gratification."'"  *Id.*, quoting *State v. Clark*, 2d Dist. Clark No. 2013 CA 52, 2014-Ohio-855, ¶ 12, quoting *State v. Gesell*, 12th Dist. Butler No. CA2005-08-367, 2006-Ohio-3621, ¶ 25.  "The trier of fact may infer from the evidence presented at trial whether the purpose of the touching was for the defendant's sexual arousal or gratification."  *Id.*, citing *Clark* at ¶ 12.

{¶11} At trial, S.E. testified that she was born in April of 2004 and that she was 13 years old at the time of trial.  (Sept. 26, 2017 Tr., Vol. I, at 43-44).  She

testified that she was 11 years old in 2015. (*Id.* at 44). S.E. testified that she was "touched" by Coleman in her room "in the mornings when [she] went and got up for school." (*Id.* at 46-47). She testified that Coleman touched her while she was in her bed. (*Id.* at 48). According to S.E., Coleman "walked in and got into [her] bed." (*Id.* at 48). She testified that no one else was in her room when Coleman touched her. (*Id.* at 47). S.E. marked a diagram of a female child's body to identify the places that Coleman touched her. (*Id.* at 50). S.E. "marked something on the front." (*Id.*). (*See* State's Ex. A). When asked if she knew the name for the part of the body that she marked, she indicated that she did not know. (Sept. 26, 2017 Tr., Vol. I, at 50). However, she agreed that she has "heard some people call it breasts." (*Id.* at 51). When Coleman touched the "upper part" of her body, Coleman touched her on top of her clothes. (*Id.*). Coleman touched the upper part of S.E.'s body more than one time. (*Id.* at 52). According to S.E., Coleman told her "not to tell" after he touched her. (*Id.* at 51).

{¶12} On cross-examination, S.E. testified that she shared a bedroom with her sister and that her sister was in the room when Coleman touched her. (*Id.* at 59). According to S.E., Coleman would wake S.E. first and that her sister was asleep when Coleman touched her. (*Id.* at 59-60, 62). She testified that Coleman touched her "[m]ore than once" but could not recall any details of the other times that

-7-

Coleman touched her. (*Id.* at 62-63). She testified that she did not tell her mother or scream because she was afraid of Coleman. (*Id.* at 60).

{¶13} On re-direct examination, S.E. testified that she was afraid of Coleman because "[h]e used to beat [them]." (*Id.* at 63). She testified that "a few" times she was "fast enough" to lock the bedroom door to prevent Coleman from entering in the morning. (*Id.*).

{¶14} On re-cross examination, S.E. testified that she immediately told her mother when Coleman beat her. (*Id.* at 64). Although she previously stated that Coleman only touched her when they lived in an apartment, she testified that it happened when they lived in the apartment and a house. (*Id.* at 65). She stated that she would only try to lock the door when they lived in the house. (*Id.* at 64-65). She testified that, although she could have, she did not lock the door when she went to bed because she "was told to go to bed." (*Id.* at 66).

{¶15} The State called Julie Kurtz ("Kurtz") who testified that she is a school counselor at Bellefontaine Middle School. (*Id.* at 26-27). Prior to working as a school counselor, Kurtz worked for children's services for 14 years where she received training and experience investigating child-sexual-abuse allegations. (*Id.* at 28).

{¶16} According to Kurtz, S.E., who was a seventh-grade student at the time, was sent to her office on August 31, 2016 because she "was crying and was upset"

during class. (*Id.* at 30). S.E. "told [Kurtz] that her mom's ex-boyfriend had touched her inappropriately." (*Id.* at 31). When asked what she meant, S.E. indicated that Coleman touched her breast area. (*Id.* at 31). Based on her training and experience, Kurtz testified that S.E.'s behavior and statements were consistent with that of a child who had been sexually abused. (*Id.* at 33). She further testified that it is "not unusual" for a child to make a delayed disclosure of sexual abuse. (*Id.*). As a result of S.E.'s assertion, Kurtz reported S.E.'s allegations to Logan County Children's Services. (*Id.* at 32).

{¶17} On cross-examination, Kurtz testified that she knew that S.E. was diagnosed with bipolar disorder. (*Id.* at 35). She testified that S.E. had "crying spree[s] in school," which can be a symptom of bipolar disorder. (*Id.*). Further, "at some point before she was in middle school [she was] put * * * on a * * * plan for depression, and crying is also a symptom of depression." (*Id.* at 35, 38). She testified that "there is no cookie-cutter" description of a child that has been sexually abused. (*Id.* at 37).

{¶18} On re-direct examination, she confirmed that she did not observe "anything inconsistent" with that of a child who has been sexually abused. (*Id.* at 38).

{¶19} On re-cross examination, Kurtz testified that "chang[ing] her story" or providing "different information here or there" are examples of inconsistent

behavior. (*Id.* at 39). She testified that she talked with S.E. one time regarding the sexual abuse. (*Id.*).

{¶20} Trista Harris ("Harris"), S.E.'s mother, testified that she was romantically involved with Coleman and that Coleman moved in with her and her children after they had been in a relationship for one year. (*Id.* at 67-69). She testified that she ended her relationship with Coleman after "he became verbally and physically abusive" in November of 2013 or 2014. (*Id.* at 71). After she and Coleman ended their relationship, she moved with her children from the apartment to the house. (*Id.*). A few months later, she and Coleman rekindled their relationship. (*Id.* at 72). They finally ended their relationship in April 2015 when Coleman "was physically abusive toward" Harris. (*Id.*).

{¶21} Harris, who worked third shift, left work early one night and discovered Coleman sleeping in S.E.'s bed with S.E. (*Id.* at 74, 77). When Harris confronted Coleman, Coleman, who "had been drinking," told Harris "that he must have went into the wrong room." (*Id.* at 76). Harris asked S.E. about the incident the next morning, and S.E. indicated that there was nothing that she needed to tell her mother. (*Id.* at 77). A few days later, Harris contacted law enforcement after "[a]n altercation occurred"; however, Harris did not tell law enforcement about discovering Coleman sleeping in S.E.'s bed with S.E. (*Id.* at 77-78).

{¶22} According to Harris, Coleman "smacked" S.E. "in the face once," and Harris informed Coleman "that he was not to touch [her] kids." (*Id.* at 78). Harris did not report the incident to law enforcement. (*Id.* at 79).

{¶23} On cross-examination, Harris testified that she did not report any of the physical abuse to law enforcement because she was "scared" of Coleman. (*Id.*). She testified that S.E. was first put on medication for her bipolar disorder when S.E. "was in first grade" because "[s]he was having problems in school focusing on her work, having emotional breakdowns." (*Id.* at 81). S.E. continued to experience those "problems" through the fifth grade. (*Id.*). Harris clarified that S.E. experienced those problems prior to meeting Coleman. (*Id.*).

{¶24} Detective Blake Kenner ("Detective Kenner") of the Bellefontaine Police Department testified that he investigated S.E.'s allegations. (*Id.* at 99-100). As part of his investigation, he interviewed Coleman. (*Id.* at 103-105). Regarding Coleman's interview, Detective Kenner testified

> In my 25 years of law enforcement, I've spoken with people whom were eventually found guilty of crimes and I've talked with people who had not committed a crime. I laid some things out to [Coleman] and made some comparisons for [Coleman], and I found it strange that I didn't get a real reaction from him, an emphatic reaction from him, an emphatic denial from him when I was saying improper,

inappropriate touching as opposed to rape. I expected an explosion. I expected, ["]Are you kidding me?["] I expected something. I * * * didn't get any of that. I got [a] very calm, * * * ["]right, right. I appreciate that.["] That, to me, I wouldn't see that in someone who did not commit the crime. That's my opinion.

(*Id.* at 106). He also testified that Coleman denied S.E.'s allegations. (*Id.* at 107).

**{¶25}** S.E. was interviewed by a forensic interviewer. (*Id.* at 102). Detective Kenner identified State's Exhibit E as the video recording of S.E.'s interview, which was later played for the jury. (*Id.* at 105, 118-119); (State's Ex. E).

**{¶26}** Kerri Wilkinson ("Wilkinson"), a licensed social worker at Nationwide Children's Hospital in Columbus, Ohio, testified that she is a forensic interviewer—"a trained professional * * * taught to recognize child development [and] how to interview children when there's allegations of physical abuse or sexual abuse." (Sept. 27, 2017 Tr., Vol. II, at 160-162). She testified that, based on her training and experience, "[d]elayed disclosure" of sexual-abuse allegations is "a common occurrence." (*Id.* at 167).

**{¶27}** Wilkinson testified that she interviewed S.E. on September 6, 2016. (*Id.* at 163-164). (*See also* State's Ex. E). Wilkinson testified that, during the interview, S.E. "was having some emotional responses to what had happened to her" when S.E. described "the alleged abuse." (Sept. 27, 2017 Tr., Vol. II, at 170). She

further testified that S.E. "was consistent in her statements about being sexually abused." (*Id.* at 173).

**{¶28}** On cross-examination, Wilkinson testified that it is not her job to "determine whether this child is telling [her] the truth or not." (*Id.* at 174-175). Prior to talking with Wilkinson, S.E. talked with Kurtz and children's services; however, Wilkinson did not know whether S.E.'s "story" was consistent. (*Id.* at 175).

**{¶29}** On re-cross examination, Wilkinson agreed that if S.E. was "asked leading questions" during a previous interview, S.E.'s interview with Wilkinson "could have been tainted." (*Id.* at 178).

**{¶30}** The State presented the testimony of Elizabeth Ramsey ("Ramsey"), a mental-health therapist at Consolidated Care in Bellefontaine, Ohio. (Sept. 26, 2017 Tr., Vol. I, at 109). Ramsey testified that she provided mental-health care for S.E. and first encountered S.E. on October 25, 2016 "for an assessment following contact through a crisis intervention, which occurred on October 19, 2016." (*Id.* at 111). On October 19, 2016, S.E. was taken to the emergency room "because she disclosed that she had been self-harming in the form of cutting." (*Id.*). According to Ramsey, S.E. reported to Harris "that the reason for that behavior" was because Coleman "had been sexually abusing her." (*Id.* at 111-112). Ramsey testified that, based on her training and experience, cutting is "consistent with a child sexual assault." (*Id.*

at 112). She testified that S.E. disclosed to her that Coleman "would come into her room, lay down with her and begin touching her," that "this happened regularly," that "this is how he would awaken her for school, and that he would touch her on her breasts and touch her legs." (*Id.* at 113).

**{¶31}** At the conclusion of the State's evidence, the State moved to admit its exhibits and rested. (*Id.* at 179-180). State's Exhibits A, B, C, and E were admitted without objection, and State's Exhibit D was admitted over the defense's objection. (*Id.*). Next, Coleman made a Crim.R. 29(A) motion, which the trial court denied. (*Id.* at 180-181).

**{¶32}** Coleman testified in his defense. (*Id.* at 183). He testified that he met Harris in 2012 and that they became romantically involved a few months after they met. (*Id.* at 184). He testified that he moved in with Harris and her children one year after they began their relationship, or "right at the beginning of 2014." (*Id.* at 184-185). He further testified that he and Harris ended their relationship "at the end of 2014," and Harris and her children moved out of the apartment to the house at that time. (*Id.* at 185). Coleman testified that they later rekindled their relationship and he "ended up moving" in the house with Harris and her children. (*Id.*).

**{¶33}** Coleman denied having any sexual contact with S.E. (*Id.* at 192). He also denied that Harris caught him sleeping in S.E.'s bed in April 2015. (*Id.* at 188-

189). He hypothesized that Harris "said that to add weight to her daughter's story about what has occurred." (*Id.* at 188).

**{¶34}** According to Coleman, S.E. "did not have a great deal of emotional control." (*Id.* at 191). As such, Coleman stated that "the only reasonable explanation that [he] can think of [regarding S.E.'s allegations] is that when [Harris] and [Coleman] lived together, [S.E.] was having these emotional issues and [they] were working on [coping with those issues]" and that S.E. "feels abandoned and doesn't have that environment that she had before" Coleman and Harris ended their relationship. (*Id.* at 192). Coleman opined that "this is her way of trying to get back at [him]" for moving out of the house. (*Id.*).

**{¶35}** Thereafter, the defense rested. (*Id.* at 195). The State did not present any witnesses on rebuttal, and the matter was submitted to the jury, which found Coleman guilty as to one count of gross sexual imposition. (*Id.* at 195, 225-227). The jury could not reach a decision as to the other counts. (*Id.* at 227). Subsequently, the trial court granted Coleman's Crim.R. 29 motion as to those counts. (*Id.* at 229).

**{¶36}** We first review the sufficiency of the evidence supporting Coleman's gross-sexual-imposition conviction. *State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999). Coleman challenges the sufficiency of the

evidence supporting whether: (1) Coleman touched S.E.'s breast; (2) Coleman touched S.E.'s breast for the purpose of sexually arousing or gratifying either person; and (3) S.E. was less than thirteen years of age at the time of the offense.[1]

{¶37} There is sufficient evidence that Coleman engaged in sexual contact with S.E. S.E. testified that Coleman touched the "upper part" of her body over her clothes. She marked an "X" on a diagram of a female child's body to indicate where Coleman touched her. (*See* State's Ex. A). S.E. agreed that she has heard that part of the human body referred to as "breasts." (Sept. 26, 2017 Tr., Vol. I, at 50). That act constitutes sexual contact under R.C. 2907.01(B). *See State v. White*, 3d Dist. Seneca No. 13-16-21, 2017-Ohio-1488, ¶ 42, citing *Jones*, 2015-Ohio-4116, at ¶ 50. Moreover, S.E. testified that Coleman admonished her not to tell anyone after he sexually abused her. The evidence that Coleman touched S.E.'s breast coupled with his admonishment not to tell anyone is sufficient to permit a reasonable trier of fact to infer that the purpose of the touching was for Coleman's sexual arousal or gratification. *Compare In re J.F.*, 8th Dist. Cuyahoga No. 96875, 2012-Ohio-2191, ¶ 29 ("We find that the evidence of J.F. touching A.G. while alone in a closet coupled with his admonition not to tell anyone is sufficient for the trier of fact to reasonably infer that the touching was for the purpose of sexual arousal or gratification.").

---

[1] Coleman does not challenge the element that he is not married to the victim.

{¶38} The State also presented sufficient evidence that the sexual contact occurred while S.E. was less than thirteen years of age. *See White* at ¶ 38, 43. Although S.E. did not provide a specific date when Coleman touched her, S.E. testified that Coleman touched her when she lived in the apartment and the house— a time period during which S.E. was less than thirteen years of age. *See Jones* at ¶ 50 ("While K.D. did not provide specific dates when these acts occurred, K.D.'s mother testified that Jones babysat K.D. at the S. Road address both before and after his return to Dayton in September 2012, a period in which K.D. would have been either nine or ten years old."). Indeed, S.E. testified that she was born in 2004 and that she was 11 years old in 2015. Coleman testified that he moved in with Harris and her children in early 2014. Harris and her children moved from the apartment to the house in late 2014 after Harris and Coleman ended their relationship. A few months later, Harris and Coleman rekindled their relationship. The relationship finally ended in April 2015.

{¶39} Thus, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that Coleman engaged in sexual contact with S.E., while S.E. was less than thirteen years of age. *See White* at ¶ 44, citing *Jones* at ¶ 53.

{¶40} However, Coleman argues that his gross-sexual-imposition conviction is based on insufficient evidence because the State failed to present evidence

corroborating S.E.'s statements. He contends that because a sexual-imposition conviction under R.C. 2907.06 requires corroboration, a gross-sexual-imposition conviction should also require corroboration since sexual imposition is a lesser-included offense of gross sexual imposition. Coleman's argument is erroneous for two reasons. First, Coleman's argument "is irrelevant here because the question is sufficiency, not weight," and S.E.'s testimony, if believed, is sufficient to establish all of the elements of gross sexual imposition. *State v. J.M.*, 10th Dist. Franklin No. 14AP-621, 2015-Ohio-5574, ¶ 17, citing *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 53. Second, gross sexual imposition under R.C. 2907.05 does not require corroborating evidence. *State v. Coran*, 2d Dist. Clark No. 2014-CA-17, 2014-Ohio-4406, ¶ 11.

{¶41} Therefore, we conclude that there is sufficient evidence that Coleman committed gross sexual imposition under R.C. 2907.05(A)(4).

{¶42} Having concluded that Coleman's gross-sexual-imposition conviction is based on sufficient evidence, we next address Coleman's argument that his conviction is against the manifest weight of the evidence. *See Velez*, 2014-Ohio-1788, at ¶ 76. Coleman argues that his gross-sexual-imposition conviction is against the manifest weight of the evidence because S.E.'s testimony was not credible. In particular, he contends that the evidence that he did not touch S.E. is weightier than the evidence that he touched S.E. because S.E.'s testimony was "vague and

conflicting"; S.E. "indicated, in testimony, that she was not necessarily truthful during her videotaped interview"; and S.E. suffers "from pre-existing emotional issues." (Appellant's Brief at 16).

{¶43} Even if the evidence is not viewed in a light most favorable to the prosecution, "through which we examine the sufficiency of the evidence, this is not an exceptional case where the evidence weighs heavily against the convictions." *State v. Suffel*, 3d Dist. Paulding No. 11-14-05, 2015-Ohio-222, ¶ 33. "As with many sexual-abuse cases, this case presents the 'classic "he-said/she-said"' scenario, 'with no physical evidence to corroborate the [victim's] allegation[s].'" *White*, 2017-Ohio-1488, at ¶ 50, quoting *In re N.Z.*, 11th Dist. Lake Nos. 2010-L-023, 2010-L-035, and 2010-L-041, 2011-Ohio-6845, ¶ 79. "'Thus, credibility of the witnesses was the primary factor in determining guilt.'" *Id.*, quoting *In re N.Z.* at ¶ 79.

{¶44} As we noted above, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *DeHass*, 10 Ohio St.2d 230 at paragraph one of the syllabus. "'When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact."'" *White* at ¶ 50, quoting *In re N.Z.* at ¶ 79, quoting *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). "'A fact finder is free to believe all,

some, or none of the testimony of each witness appearing before it.'" *Id.*, quoting *In re N.Z.* at ¶ 79, citing *State v. Thomas*, 11th Dist. Lake No. 2004-L-176, 2005-Ohio- 6570, ¶ 29. *See also State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 44, quoting *State v. Daley*, 3d Dist. Seneca No. 13-13-26, 2014-Ohio-908, ¶ 15, quoting *State v. Antill*, 176 Ohio St. 61, 67 (1964). "'"A verdict is not against the manifest weight of the evidence because the [jury] chose to believe the State's witnesses rather than the defendant's version of the events."'" *Missler* at ¶ 44, quoting *State v. Bean*, 9th Dist. Summit No. 26852, 2014-Ohio-908, ¶ 15, quoting *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16.

**{¶45}** In this case, S.E. testified to her version of events surrounding the sexual abuse that led to Coleman's gross-sexual-imposition conviction, and the jury found S.E. credible. *See White* at ¶ 51. Although S.E. was inconsistent in her testimony describing Coleman's sexual abuse, the jury also observed Coleman's testimony, "and we are mindful of the jury's 'superior first-hand perspective in judging the demeanor and credibility of witnesses.'" *Suffel* at ¶ 33, quoting *State v. Phillips*, 10th Dist. Franklin No. 14AP-79, 2014-Ohio-5162, ¶ 125, citing *DeHass* at paragraph one of the syllabus. Thus, despite Coleman's denial that he sexually abused S.E., the jury heard the testimony of three witnesses with experience in sexual-abuse cases involving children—Kurtz, Wilkinson, and Ramsey—in addition to S.E.'s testimony. Kurtz and Wilkinson testified that S.E.'s behavior was

consistent with that of a child who had been sexually abused. Similarly, Ramsey testified that S.E. reported that she was cutting herself because Coleman sexually abused her, and Ramsey testified that cutting behavior is consistent with child sexual abuse. Further, despite the inconsistencies between S.E.'s testimony and the statements she made during her interview with Wilkinson, the jury was able to observe the entirety of the interview, including S.E.'s non-verbal, emotional responses to Wilkinson's questions regarding Coleman's acts.

{¶46} For these reasons, Coleman's argument is unpersuasive. Accordingly, we cannot conclude that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that Coleman's conviction must be reversed and a new trial ordered.

{¶47} Coleman's assignments of error are overruled.

{¶48} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ZIMMERMAN and SHAW, J.J., concur.**

**/jlr**